# William HOUSE *v.*
# VOLUNTEER TRANSPORT, INC.

05–203                                             223 S.W.3d 798

### Supreme Court of Arkansas
### Opinion delivered January 19, 2006

*Eubanks, Baker & Schulze,* by: *J. G. Schulze,* for appellant.

*Mercy, Carter, Tidwell, LLP,* by: *W. David Carter,* for appellee.

ROBERT L. BROWN, Justice. Appellant William House appeals from the circuit court's entry of judgment which awarded him $78,000 in compensatory damages, following this court's remand in *Volunteer Transp., Inc. v. House,* 357 Ark. 95, 162 S.W.3d 456 (2004), for a trial on damages. He asserts three points on appeal, none of which has merit. We affirm the circuit court.

On August 7, 2001, House was injured in a motor-vehicle accident in Florida, when his tractor-trailer rig was struck by another truck owned by Volunteer Transport. House filed suit in Arkansas and was granted a default judgment by the circuit court on both liability and damages. The damages awarded were in the amount of $4,835,000.00. This court affirmed the grant of default judgment for purposes of liability, but we reversed and remanded the matter for a trial on damages. *See Volunteer Transp., Inc. v. House, supra.*

Following remand, a jury trial was held on October 27, 2004, on the issue of damages. The jury awarded House $78,000 in compensatory damages and no punitive damages. It is this judgment that he now appeals.

## I. 2000 Demand Letter

House first contends that the demand letter for $3,891,417.05, which his previous counsel wrote on an earlier claim stemming from a separate 1999 accident, negatively influenced the jury in 2004 and created the appearance that he suffered extraordinary injuries in the 1999 accident. He claims that any reference to that letter violated Arkansas Rule of Evidence 408. He adds that no assertion of fact in the letter contradicted any factual assertion made by him at trial in 2004. The prejudice, he maintains, resulting from the letter's admission was serious. For that reason, he claims that the jury's verdict should be set aside and he should be awarded a new trial on the damages issue.

We begin by observing that evidentiary rulings are within the sound discretion of the circuit court and will not be disturbed absent a manifest abuse of that discretion. *See Ozark Auto Transp., Inc. v. Starkey*, 327 Ark. 227, 937 S.W.2d 175 (1997).

In the instant case, House testified at the damages trial that on July 26, 1999, he was involved in an accident in which a drunk driver hit his vehicle. He testified that, as a result of the accident, his wrists were swollen, he had an injury to his right shoulder, the right side of his neck was hurting, he had headaches, and he had a lower-back injury. He further testified that he undertook a course of therapy treatment with Dr. Roshan Sharma from August 17, 1999, until October 13, 1999, during which time he saw the doctor three times each week for heat treatments and electric therapy to his shoulder. He added that during the course of his treatment, he could drive his truck. House further admitted that he was still experiencing some discomfort, such as stiffness and soreness, from March through June 2000 in his wrists and in his neck.

Following the 2001 accident at issue, House testified that he was treated by a chiropractor, Dr. Joseph Young, from August 13, 2001, through September 21, 2001. He testified that as of late September, he was still having problems with his neck and with his right hand, and that on September 17, 2001, he underwent an MRI. He testified that later, he had laser surgery on his neck, and still later, a fusion. He then compared the difference in the pain to his neck area from the 1999 accident and the 2001 accident:

> The pain is in the same area. The pain in '99 was more of a, I believe, a muscular thing. It was something that I — it interrupted

my sleep. But I eventually when [sic] I went to sleep I was able to sleep. Sometime [sic] I had relief from it, sometime [sic] I didn't. But eventually it did go away. The pain I have now, it gets worse. It's a stabbing. It is like a toothache all the time. It's something that won't let me sleep. If I use my right hand at all, I mean I can use my right hand. I can pick up something with it. But after that I am going to feel it, I mean immediately, so I try not to use it at all. It is a pain that just won't go away. I don't know how to describe it. I never had a pain like this before. It is a pain I wish sometimes, like my wife had said, instead I wish I would have died in that accident in the fall. It is not any way for anybody to live and I can't control it. And it irritates me because there is nothing, there is nothing I can do about it. I have tried everything, I mean everything, and there is no way to relieve it.

On cross-examination, House admitted that in May 2000, he discussed with his family doctor the possibility of going to see a neurosurgeon. He further admitted that in June 2000, he returned for a referral to a specialist because of continuing pain in the right side of his neck to the right shoulder. He agreed that within a week or two of his last treatment with Dr. Sharma on October 13, 1999, he was back on the job. He then admitted hiring counsel to pursue a claim against his insurance company under his underinsured-motorist provision for the 1999 accident.

Defense counsel next questioned House, over his objections, about a demand letter which his attorneys sent to his insurance company in 2000. The demand letter, dated March 8, 2000, was in reference to the July 26, 1999 accident and read that House had suffered "damage to his neck radiating into the right shoulder and forearm and lower back pain." It further said that House had not completed his treatment at the time and that statements from two doctors showed he was unable to drive a tractor-trailer rig due to the injuries he sustained. The letter then broke down the damages he had incurred, which totalled $3,891,417.05, and stated that this amount, or the policy limits, whichever was greater, would be accepted as a full and final settlement.

House challenges the use of this demand letter on cross-examination and urges that this admission violates Arkansas Rule of Evidence 408, which provides:

> Evidence of (1) furnishing, offering, or promising to furnish, or (2) accepting, offering, or promising to accept, a valuable consider-

ation in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion if the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Ark. R. Evid. 408 (2005).

This court has held that Rule 408 does not effect a blanket prohibition against the admission of all evidence relating to offers of compromise or settlement. *See Ozark Auto Transp., Inc. v. Starkey, supra.* Instead, the rule only prohibits the introduction of settlement evidence when the evidence is offered to prove liability for, invalidity of, or the amount of the claim or any other claim. *See id.* Rule 408 does not prohibit the use of such evidence when it is introduced for any other reason. *See id.* We held specifically, in *Edward v. Stills,* 335 Ark. 470, 984 S.W.2d 366 (1998), that settlement evidence is admissible when it is used to impeach one's credibility and when it is relevant under Ark. R. Evid. 401.

The evidence in the instant case was clearly relevant. Rule 401 provides that relevant evidence is that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. Furthermore, Rule 403 requires that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403.

In the case at hand, House had described his injuries from the 1999 accident in direct examination by stating that they were, in essence, insubstantial. However, his medical records and the 2000 demand letter indicated that he had indeed suffered injuries similar to those he sustained in the 2001 accident. The demand letter further indicated that contrary to his claims otherwise, he was still suffering from those 1999 injuries in March 2000, which was much longer than a few weeks after his last treatment in

October 1999. For these reasons, we hold that the demand letter was legitimately used for impeachment purposes at the damages trial in 2004.

There is a second reason that we affirm on this point. In *Clawson v. Rye*, 281 Ark. 8, 661 S.W.2d 354 (1983), this court held that where testimony regarding a prior lawsuit and settlement was in regard to a *prior* accident, and not the one at issue, the admission of that testimony was permissible to show that the plaintiff had suffered prior injuries, despite this court's previous holdings that offers of compromise or settlement are not admissible. We stated that the evidence was relevant to the jury's determination of damages and was admissible where the first accident occurred in April 1977 and the second was a similar accident that occurred in November of the same year. We held that it was relevant for the jury to be made aware that Mrs. Clawson suffered damages from a prior accident in order to fairly decide the injury and assess the damages in the later case.

■ The same holds true in the case before us. It was certainly reasonable that the jury awarding House's damages in 2004 know the extent of his claims of injuries arising from his prior accident in 1999 in order to correctly assess damages arising from the 2001 accident. Because of this, the demand letter in 2000 had independent relevance and was admissible. We hold that the circuit court did not err in admitting it.

## II. Hearsay of Prior Doctors

House next maintains that the circuit court erred in allowing Volunteer Transport to paraphrase letters from two doctors, Dr. Raker and Dr. Feir, which had been excluded from evidence as hearsay. The two letters were referred to by defense counsel when questioning House's expert witness, Dr. Brett Dietze, regarding his opinion of the letters and their assessment of House's 1999 injuries. House claims that Dr. Dietze did not assign any particular credibility to the letters and further claims that Dr. Dietze merely agreed that defense counsel was reading the letters correctly. He contends that at no time did Dr. Dietze testify that he relied on either opinion and emphasizes that Dr. Dietze specifically stated that neither opinion influenced or changed his own opinion. House contends that Volunteer Transport produced the two doctors' letters for the purpose of proving the truth of the matter asserted therein, which was that House was unable to drive his

truck at the time the letters were written. Thus, he concludes that the letters are hearsay and that they were highly prejudicial to his case.

Our analysis of this point begins with the fact that on cross-examination, Dr. Dietze testified that House represented to him that the problems with his neck stemmed from injuries incurred in August 2001. Dr. Dietze further testified that he assumes a patient is providing him with an accurate medical history and that he relies on that history in forming his opinion. Dr. Dietze then agreed with defense counsel's statement that he had not had occasion to review any of House's medical records prior to August 2001. Defense counsel proceeded to walk Dr. Dietze through the records of the two doctors. At the conclusion of this review, the following colloquy took place:

> DEFENSE COUNSEL: Can you agree with me, Dr. Dietze, in view of these records we have gone through, that Mr. House would have had an ongoing degenerative condition in his neck prior to August of 2001?
>
> DR. DIETZE: Yes.
>
> DEFENSE COUNSEL: And these records also indicate that Mr. House had chronic, ongoing complaints of neck pain, radiating down into his right shoulder, and perhaps to some extent, the right arm during these two years, or so, between July of '99 and August of 2001?
>
> DR. DIETZE: Yes.
>
> . . . .
>
> DEFENSE COUNSEL: According to the records we have reviewed here today, Dr. Raker and Dr. Feir considered Mr. House to be physically unfit, in the case of Dr. Raker, and emotionally or psychologically unfit to be driving a tractor trailer rig in the spring of 2000?
>
> DR. DIETZE: That's what their recommendations were.
>
> DEFENSE COUNSEL: Understanding now that we have gone through those records, Doctor, can you agree that Mr. House was in need of surgical evaluation before August of 2001?

DR. DIETZE: I can't really say that. I can say he had neck pain. And I mean, whether or not he actually needed surgery or not, I just don't know.

DEFENSE COUNSEL: The same symptoms that you treated him for were showing up as early as 1999, after the first accident?

DR. DIETZE: I mean he was having neck pain and arm pain, yes.

DEFENSE COUNSEL: And radiculopathy into that right upper extremity?

DR. DIETZE: Correct.

DEFENSE COUNSEL: And the surgery you performed, as you already indicated, was to treat the neck pain and these radiating problems into that right shoulder and arm?

DR. DIETZE: Yes.

DEFENSE COUNSEL: And can you now agree that these records that we have gone through today show that these symptoms existed before August, 2001, in Mr. House?

DR. DIETZE: Yes.

This court has held that once an expert witness such as Dr. Dietze is qualified, the weakness in any factual underpinning of the expert's opinion may be explored on cross-examination, and such a weakness goes to the weight and credibility of the expert's testimony. *See, e.g., SEECO, Inc. v. Hales*, 341 Ark. 673, 22 S.W.3d 157 (2000). A review of Dr. Dietze's cross-examination reveals that Volunteer Transport used the prior opinions of the two doctors to test the reliability of Dr. Dietze's testimony and credibility. While Dr. Dietze had not previously seen the records, he had indicated that his diagnosis and treatment were premised upon the medical history provided to him by House. The use of the records during cross-examination allowed defense counsel to show that the symptoms on which Dr. Dietze based his opinions had existed prior to 2001, contrary to what he had relied on in forming his opinions.

This court has previously permitted the verbatim reading of another medical opinion by an expert on cross examination. See *J.E. Merit Constructors, Inc. v. Cooper*, 345 Ark. 136, 44 S.W.3d 336 (2001). In *J.E. Merit,* Merit Constructors contended that it was error for the circuit court to require its expert, Dr. Rutherford, to read verbatim the records of Cooper's initial treating doctor, Dr. Samlaska, as part of cross-examination. This court noted, however, that Merit Constructor's counsel had given Dr. Rutherford medical records, including Dr. Samlaska's, for him to review and to formulate his opinions, and further noted that he disagreed with Dr. Samlaska's diagnosis of Cooper. During Cooper's counsel's cross-examination of Dr. Rutherford, counsel asked him to read from Dr. Samlaska's records as part of cross-examination on how her diagnosis and treatment affected his medical opinion.

This court affirmed the circuit court's ruling on the matter and said:

> Here, the records were not being introduced as part of the plaintiff Cooper's case in chief; rather, Cooper sought to use the records — furnished to Dr. Rutherford by defense counsel — to cross-examine Dr. Rutherford on the basis of his medical conclusions and to determine his credibility. This court has traditionally taken the view that the cross-examiner should be given wide latitude because cross-examination is the means by which to test the truth of the witness's testimony and credibility. . . .

*Id.* at 147, 44 S.W.3d at 345. We added that under Ark. R. Evid. 703, an expert witness must be allowed to disclose to the trier of fact the factual basis for his or her opinion because the opinion would otherwise be left unsupported, and the trier of fact would be left with little if any means of evaluating its correctness. We further noted that it was significant that Merit Constructors gave Dr. Rutherford Cooper's medical records to aid him in forming his opinion. We held that in using Dr. Samlaska's records during cross-examination, Cooper's counsel engaged in valid cross-examination to test the credibility of Dr. Rutherford's conclusions and to examine the factual basis for Dr. Rutherford's expert opinion.

While Dr. Dietze, in the instant case, did not rely upon the opinions at issue of either Dr. Raker or Dr. Feir, he did state that his diagnosis and treatment were based on the medical history provided to him by House. House had told him that his injuries were the result of the 2001 accident. Yet, as was made evident by

the opinions of Dr. Raker and Dr. Feir, House had suffered similar injuries prior to 2001. The two medical reports were used to determine the credibility of Dr. Dietze's testimony. There was no error by the circuit court in allowing this cross-examination.

### III. Police Report from 1999

House argues, as his third point, that the circuit court also erred when it permitted Volunteer Transport to challenge his testimony that the adverse driver in the 1999 accident had been drinking. Specifically, defense counsel was allowed to refer to portions of a 1999 police report during cross-examination of House. House contends that Volunteer Transport sought to draw the inference that if the police report made no mention of any intoxication, House was untruthful in his testimony about the driver being intoxicated. House asserts that the police report was hearsay and that the means used by defense counsel prejudiced him beyond repair.

At the damages trial, after House testified that the driver who hit him in the 1999 accident was intoxicated, defense counsel handed House a copy of the police report from the 1999 accident and commented that intoxication was not a factor checked by the trooper in his report. Defense counsel continued to question House regarding the report:

> DEFENSE COUNSEL: I will represent to you that there was one [factor] to check for driving under the influence or driving while intoxicated and it is not checked on this [1999] report, Mr. House. You don't have a report from the Florida State Police that says our driver [in the 2001 accident] was intoxicated, do you?

> HOUSE: No, but there is a supplement to this [1999] report that says the driver, the driver [sic], after it came back from autopsy he was legally intoxicated and it was attached to this report. You only have a portion of it.

> DEFENSE COUNSEL: I will represent to you that in the entirety of the Associates Insurance Company's file there ain't such a supplement.

> HOUSE: There is such a report, yes, sir.

At that time, counsel for House again objected that defense counsel's questioning was improper, and the circuit court sustained the objection. House now claims that this line of questioning prejudiced his right to a fair trial.

We disagree. Typically, police reports are not within the public-records exception to the hearsay rule and can be deemed to be inadmissible hearsay. *See* Ark. R. Evid. 803(8); *Southern Farm Bureau Cas. Ins. Co. v. Reed*, 231 Ark. 759, 332 S.W.2d 615 (1960). Thus, assuming that the circuit court erred in allowing defense counsel to pursue the line of questioning about the police report, the question becomes what impact this error had. We conclude that the impact was minimal at best.

First, the police report concerned House's 1999 accident, not the accident in 2001. Secondly, though House and Voluntary Transport disagreed over the inebriation of the other truck driver in 1999, the materiality of the police report to the issue of damages in 2001 appears virtually nonexistent.

House fails to point to any specific prejudice he suffered due to defense counsel's cross-examination attempts with the 1999 police report, and we discern none. The colloquy concerning the report appears to fall more into the category of a dispute over a minor detail. This court has held that unless an appellant demonstrates prejudice accompanying error, we will not reverse. *See, e.g., Campbell v. Entergy Arkansas, Inc.*, 363 Ark. 132, 211 S.W.3d 500 (2005).

For these reasons, we affirm the circuit court on this point.

Affirmed.