2011 Ark. 518

BAYER CROPSCIENCE LP; Bayer CropScience Holding, Inc.; Bayer CropScience AG; Bayer AG; and Bayer BioScience NV, Appellants

v.

Randy SCHAFER; end of the Road Farms, Inc.; Schafer Planting Co.; Wallace Farms; Robert E. Moery; Kyle Moery; Carter Farms Partnership; Petrus Farms, Inc.; Robert Petrus, Individually and as Trustee of the Robert Petrus Revocable Trust; R & B Amaden Farms; Randall J. Snider; R & S Planting Co., Inc.; S & R Farms; A.S. Kelly and Sons; Neil Daniels Farms, Appellees.

No. 10–1246.

Supreme Court of Arkansas.

Dec. 8, 2011.

Wright, Lindsey & Jennings, LLP, by: Edwin L. Lowther, Jr., Scott Irby, and Gary D. Marts, Jr., for appellants.

Hare, Wynn, Newell & Newton, LLP, by: Scott A. Powell, Don McKenna, Bruce J. McKee, and Paul Byrd, for appellees.

Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, for amicus curiae Arkansas Trial Lawyers Association.

Barrett & Deacon, P.A., by: Barry Deacon, Andrew H. Dallas, and Jason M. Milne, for amicus curiae Riceland Foods, Inc.

Lax, Vaughn, Fortson, Jones & Rowe, P.A., by: Roger D. Rowe, for amicus curiae USA Rice Federatio, Inc.

COURTNEY HUDSON GOODSON, Justice.

Appellants Bayer CropScience LP; Bayer CropScience Holding, Inc.; Bayer CropScience AG; Bayer AG; and Bayer BioScience NV (collectively "Bayer") appeal the judgment entered by the Circuit Court of Lonoke County awarding $5,975,605 in compensatory damages and $42,000,000 in punitive damages to appellees, who are the following rice farmers or farming entities: Randy Schafer; End of the Road Farms, Inc.; Schafer Planting Co.; Wallace Farms; Robert E. Moery; Kyle Moery; Carter Farms Partnership; Petrus Farms, Inc.; Robert Petrus, individually and as trustee of the Robert Petrus Revocable Trust; R & B Amaden Farms; Randall J. Snider; R & S Planting Co., Inc.; S & R Farms; A.S. Kelly and Sons; and Neil Daniels Farms (collectively "rice farmers"). For reversal, Bayer contends that (1) the circuit court erred in ruling that Arkansas Code Annotated section 16–55–208 (Repl.2005) is unconstitutional; (2) the rice farmers' claims are barred by the "economic-loss doctrine"; (3) the circuit court abused its discretion by failing to exclude the testimony of Robert E. Marsh; (4) the circuit court erred by submitting the punitive-damage claim to the jury; and (5) the punitive-damage award is excessive under Arkansas common law and the Due Process Clause of the United States Constitution. As this appeal involves a challenge to the constitutionality of a statute, our jurisdiction is pursuant to Ark. Sup.Ct. R. 1–2(a)(1) and (b)(6). In all respects, we affirm the circuit court's judgment.

I. *Factual and Procedural Background*

To place the issues in context, a review of the record reveals the following facts. In the United States, rice is grown primarily in Arkansas, California, Louisiana, Mississippi, Missouri, and Texas. Of those states, Arkansas is the leading producer of long-grain rice. Prior to 2006, fifty-two percent of the long-grain rice grown in the United States was exported to other countries.

In the 1990s, Bayer or its corporate predecessors developed LibertyLink Rice (LLRice), a genetically engineered rice that is resistant to Bayer's "Liberty" herbicide, a broad-spectrum weed killer that is known for controlling red rice, a pernicious weed that diminishes yield and reduces the price of a rice crop. From 1999 to 2001, Bayer conducted outdoor field tests of LLRice in the United States, primarily at Louisiana State University's Rice Research Station in Crowley, Louisiana, under the supervision of Dr. Steve Linscombe.

As a genetically modified agricultural product, LLRice falls under the regulatory control of the United States Department of Agriculture (USDA). On August 18, 2006, the USDA announced that trace amounts of LLRice 601 had been detected in the United States long-grain rice supply. Initially, the strain LLRice 601 was found in Cheniere, a popular variety of long-grain rice seed. Six months later, LLRice 604 was discovered in Clearfield 131, another variety of long-grain rice. At the time of the August 2006 announcement, the USDA had not granted regulatory approval for either LLRice 601 or 604. In addition, no foreign government had authorized the commercial use of genetically modified rice for human consumption.

Because of the contamination, the USDA banned the use of Cheniere and Clearfield 131 for the 2007–2008 crop year.

Those involved in the United States rice industry, including USA Rice Federation, Inc., developed a seed plan to remove the LLRice strains from the American rice supply. Before planting, all rice seed was tested to ensure that it contained no contaminant. First handlers of rice, namely mills, were required to test harvested rice for the presence of LLRice and to document that the rice was free of contamination. The plan also included an educational campaign to promote compliance with the seed plan. Another component of the plan was to clean all rice-farming equipment and storage bins to guard against the risk of further contamination. Crop rotation was encouraged to prevent the germination of any volunteers in a field where rice had been grown in 2006.

Domestically, the USDA took swift action to grant regulatory approval of LLRice 601 in November 2006. However, the world-wide reaction to the contamination of the American long-grain-rice supply with LLRice proved to be profoundly negative, due to government and consumer antipathy toward genetically altered food sources. Mexico, the largest importer of American rice, required a certification that the rice was not genetically modified before the rice would be allowed within its borders. Canada, Iraq, Korea, Taiwan, Saudi Arabia, Cuba, and Japan required testing to guard against the infiltration of LLRice. Trade with the Philippines ceased, and Russia banned the import of all American rice. Most notably, the European Union, consisting of twenty-seven countries and representing one-sixth of the American rice export market, implemented emergency measures to impose stringent testing requirements at points of entry. Between 2005 and 2008, exports of American rice decreased by 622,972 metric tons.

The rice farmers filed suit against Bayer in the Circuit Court of Lonoke County on

August 29, 2006. In their fifth amended complaint, they alleged that Bayer knew that the majority of American-grown rice was exported; that Bayer knew that other countries did not import genetically modified rice; and that Bayer knew that any contamination of the United States rice supply with genetically altered rice would depress the export market and adversely affect the price of American long-grain rice.[1] As their cause of action, the rice farmers claimed that Bayer was negligent in allowing the adventitious release of LLRice 601 and 604 into the nation's rice supply by not taking adequate precautions during field trials to prevent cross-pollination or the commingling of genetically modified rice seed with conventional seed.[2] As damages, they claimed that Bayer's negligence caused economic harm by driving down the market price for American long-grain rice. The rice farmers also alleged that they were entitled to punitive damages because Bayer knew, or ought to have known, that their negligent conduct would naturally and probably result in damages to them and that Bayer engaged in that conduct in reckless and wanton disregard of the consequences.

During the course of the litigation, Bayer moved in limine to exclude the testimony of Robert E. "Jay" Marsh, the rice farmers' expert on the issue of damages. Bayer argued that Marsh's assessment of past damages and his projections regarding future damages were speculative and not based on sound, scientifically reliable methods. The rice farmers responded that the methodology used by Marsh was the standard approach to econometric modeling and that Marsh's testimony satisfied the test of admissibility for expert opinion.

Bayer also filed a motion for summary judgment, arguing that the rice farmers' claims should be dismissed because the "economic-loss doctrine" precludes recovery in tort for economic loss where the plaintiff has suffered no physical injury to his person or property. In opposing the motion for summary judgment, the rice farmers asserted that this court had rejected the doctrine in other contexts and that this court had not recognized the doctrine's application in negligence cases.

The rice farmers also filed a pretrial motion asking the circuit court to declare unconstitutional the limitation on punitive damages found in Arkansas Code Annotated section 16–55–208. They argued that the statutory cap on punitive damages offends the separation-of-powers doctrine found in article 4, section 2 of the Arkansas Constitution by encroaching upon the judiciary's authority to exercise remittitur and by intruding on this court's power vested under amendment 80, section 3, to prescribe the rules of pleading, practice, and procedure for all courts. In addition, the rice farmers asserted that the statute violates article 5, section 32 of the Arkansas Constitution, which prohibits the General Assembly from limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property. In response, Bayer argued that the statute's cap on punitive damages did not invade the powers of the judiciary because the law is substantive and not procedural in nature. Further, Bayer contended that the statute did not violate article 5, section 32, as its

---

1. The rice farmers asserted claims against other Bayer entities and Riceland Foods, Inc., but those claims were dismissed.

2. The rice farmers alleged additional causes of action for fraudulent concealment, ultrahazardous activity, and strict liability. Ultimately, only the negligence claim was submitted to the jury.

proscription applies only to compensatory damages.[3]

The circuit court conducted a pretrial hearing on March 22, 2010. At the hearing, the circuit court orally denied Bayer's motion in limine to exclude the testimony of Marsh, and the court refused Bayer's motion for summary judgment concerning the economic-loss doctrine. From the bench, the circuit court also ruled that Arkansas Code Annotated section 16–55–208 is unconstitutional.

The case proceeded to trial before a jury, beginning on March 23, 2010, and ending on April 15, 2010. At the conclusion of the rice farmers' case, Bayer moved both orally and in writing for directed verdict on the issue of punitive damages, arguing that the rice farmers had presented insufficient evidence to support a punitive-damage award under Arkansas Code Annotated section 16–55–206 (Supp.2011). The circuit court granted Bayer's motion with regard to the first prong of the statute concerning intentional conduct, finding that the rice farmers had produced no evidence that Bayer intentionally pursued a course of conduct for the purpose of causing injury or damage. The court denied the motion on the second prong of the statute, ruling that the rice farmers had offered substantial evidence that Bayer knew or should have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in injury or damage and that it continued the conduct with malice or reckless disregard of the consequences from which malice could be inferred. In the same fashion, Bayer moved for a directed verdict on the ground that the rice farm-

ers' claims were barred under the economic-loss doctrine. On this point, Bayer reasserted the argument advanced in its previous motion for summary judgment. The circuit court again rejected Bayer's argument and denied the motion for directed verdict. Bayer renewed these motions at the close of all the evidence, and the circuit court denied them.

The jury found that Bayer was negligent, and it awarded compensatory damages in the amounts of $44,806 to Randy Schafer; $62,660 to End of the Road Farms, Inc.; $191,239 to Schafer Planting Co.; $292,794 to Wallace Farms; $221,537 to Robert E. Moery; $117,700 to Kyle Moery; $1,386,988 to Carter Farms Partnership; $32,894 to Robert Petrus, Petrus Farms, and Robert Petrus Revocable Trust; $486,264 to R & B Amaden Farms; $1,222,523 to Randall J. Snider; $437,334 to R & S Planting Co., Inc.; $186,741 to S & R Farms; $1,046,932 to A.S. Kelly and Sons; and $245,193 to Neil Daniels Farms. The jury also assessed punitive damages of $21,000,000 against Bayer CropScience LP and $21,000,000 against Bayer CropScience AG.

On May 5, 2010, the circuit court entered judgment based on the jury's verdicts. On May 19, 2010, Bayer filed timely motions for judgment notwithstanding the verdict (JNOV), new trial, and remittitur. In its motion for new trial and remittitur, Bayer argued that the punitive-damage award should be reduced or that it be granted a new trial because the verdict was grossly excessive under both Arkansas law and the federal constitution. Bayer asked the circuit court to reconsider its decision that Arkansas Code Annotated

---

**3.** In their briefs before the circuit court, the parties quibbled over whether the statute should be subject to strict scrutiny or a rational-basis analysis. However, that standard of review applies to constitutional challenges based on equal-protection-type arguments, and thus that analysis is not applicable here. *Luebbers v. Money Store, Inc.*, 344 Ark. 232, 40 S.W.3d 745 (2001).

section 16–55–208 is unconstitutional and to apply the statutory limitation to the jury's award of punitive damages. Bayer also contended that it was entitled to JNOV or a new trial because the rice farmers did not offer substantial evidence of conduct for which punitive damages may be imposed. In addition, Bayer incorporated by reference its previously filed motions for summary judgment and directed verdict. The rice farmers opposed the motions, which were deemed denied on June 18, 2010, under Rule 4(b)(1) of the Arkansas Rules of Appellate Procedure–Civil. On July 19, 2010, each Bayer defendant filed separate and timely notices of appeal from the judgment entered on May 5, 2010. This appeal followed.

## II. *Constitutionality of Arkansas Code Annotated Section 16–55–208*

■ |₉As its first issue on appeal, Bayer contends that the circuit court erred in ruling that Arkansas Code Annotated section 16–55–208 is unconstitutional. Bayer asserts that the statute does not offend article 5, section 32 of the Arkansas Constitution and that it does not violate the constitution's provisions regarding separation of powers found in article 4, section 2 and amendment 80, section 3. We first consider Bayer's contention that section 16–55–208 does not violate article 5, section 32 of our constitution. On this question, Bayer argues that the statutory cap on punitive damages is constitutional because the prohibition against limiting the amount of recovery applies only to compensatory damages. In support of the circuit court's ruling, the rice farmers argue that the cap falls squarely within the

constitution's proscription because it limits the amount of a plaintiff's recovery.[4]

■ We begin by stating that there is a presumption of validity attending every consideration of a statute's constitutionality; every act carries a strong presumption of constitutionality, and before an act will be held unconstitutional, the incompatibility between it and the constitution must be clear. *Proctor v. Daniels,* 2010 Ark. 206, —— S.W.3d ——. Any doubt as to the constitutionality of a statute must be resolved in favor of its constitutionality, and the heavy burden of demonstrating the unconstitutionality is upon the one attacking it. *Clark v. Johnson Reg'l Med. Ctr.,* 2010 Ark. 115, 362 S.W.3d 311. When possible, this court |₁₀will construe a statute so that it is constitutional. *Cato v. Craighead Cnty. Circuit Court,* 2009 Ark. 334, 322 S.W.3d 484.

■ In this case, we are called upon to construe the meaning of the constitution. When interpreting the constitution on appeal, our task is to read the laws as they are written and interpret them in accordance with established principles of constitutional construction. *Brewer v. Fergus,* 348 Ark. 577, 79 S.W.3d 831 (2002). Language of a constitutional provision that is plain and unambiguous must be given its obvious and common meaning. *Edwards v. Campbell,* 2010 Ark. 398, 370 S.W.3d 250. Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. *Id.* It is this court's responsibility to decide what a constitutional provision means, and we will review a lower court's construction de

4. As further support of the circuit court's ruling, the rice farmers assert that the statutory cap also violates the right to a trial by jury guaranteed by article 2, section 7 of the Arkansas Constitution. However, the infringement of the right to a jury trial was not raised

before the circuit court. It is well settled that this court will not address an issue raised for the first time on appeal, even a constitutional argument. *Brown v. Kelton,* 2011 Ark. 93, 380 S.W.3d 361.

novo. *First Nat'l Bank of DeWitt v. Cruthis*, 360 Ark. 528, 203 S.W.3d 88 (2005). We are not bound by the decision of the circuit court; however, in the absence of a showing that the circuit court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. *Id.*

Section 16–55–208, which establishes limits on awards of punitive damages, is a segment of the Civil Justice Reform Act of 2003. It states as follows:

(a) Except as provided in subsection (b) of this section, a punitive damages award for each plaintiff shall not be more than the greater of the following:

(1) Two hundred fifty thousand dollars ($250,000); or

(2) Three (3) times the amount of compensatory damages awarded in the action, not to exceed one million dollars ($1,000,000).

(b) Subsection (a) of this section shall not apply when the finder of fact:

(1) Determines by clear and convincing evidence that, at the time of the injury, the defendant intentionally pursued a course of conduct for the purpose of causing injury or damage; and

(2) Determines that the defendant's conduct did, in fact, harm the plaintiff.

(c) As to the punitive damages limitations established in subsection (a) of this section, the fixed sums of two hundred fifty thousand dollars ($250,000) set forth in subdivision (a)(1) of this section and one million dollars ($1,000,000) set forth in subdivision (a)(2) of this section shall be adjusted as of January 1, 2006, and at three-year intervals thereafter, in accordance with the Consumer Price Index rate for the previous year as determined by the Administrative Office of the Courts.

Article 5, section 32 of the Arkansas Constitution, as amended by amendment 26, provides as follows:

The General Assembly shall have power to enact laws prescribing the amount of compensation to be paid by employers for injuries to or death of employees, and to whom said payment shall be made. It shall have power to provide the means, methods, and forum for adjudicating claims arising under said laws, and for securing payment of same. *Provided, that otherwise no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to persons or property;* and in case of death from such injuries the right of action shall survive, and the General Assembly shall prescribe for whose benefit such action shall be prosecuted.

(Emphasis added.) Prior to 1938, section 32 of article 5 provided that "[n]o act of the General Assembly shall limit the amount to be recovered for injuries resulting in death or for injuries to persons or property[.]" *Baldwin Co. v. Maner*, 224 Ark. 348, 273 S.W.2d 28 (1954). The language that now precedes the original text was added in 1938 with the adoption of amendment 26 in order to confer upon the General Assembly the power to enact legislation to prescribe the amount of compensation to be paid employees for injury or death. *Young v. G.L. Tarlton, Contractor, Inc.*, 204 Ark. 283, 162 S.W.2d 477 (1942).

On the occasions that we have considered article 5, section 32, we have interpreted the phrase "injuries to persons or property" as meaning physical injuries to the person and physical injuries to property. *Sw. Bell Tel. Co. v. Wilks*, 269 Ark. 399, 601 S.W.2d 855 (1980). This court has also observed that the General Assembly may alter the common law to advance rea-

sonable policy objectives. *White v. City of Newport*, 326 Ark. 667, 933 S.W.2d 800 (1996). However, our precedents firmly establish that article 5, section 32 bestows upon the General Assembly the power to limit the amount of recovery *only* in matters arising between employer and employee. *See Stapleton v. M.D. Limbaugh Constr. Co.*, 333 Ark. 381, 969 S.W.2d 648 (1998); *Maner, supra; Brothers v. Dierks Lumber & Coal Co.*, 217 Ark. 632, 232 S.W.2d 646 (1950); *Young, supra.* As we have made plain, the General Assembly "may limit tort liability only where there is an employment relationship between the parties." *Stapleton*, 333 Ark. at 392, 969 S.W.2d at 653.

 Bayer places much emphasis on distinctions drawn between compensatory and punitive damages to argue that article 5, section 32 speaks only to compensatory damages. To be certain, compensatory damages are awarded for the purpose of making the injured party whole, as nearly as possible. *Dunaway v. Troutt*, 232 Ark. 615, 339 S.W.2d 613 (1960), *overruled on other grounds by United Ins. Co. of Am. v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). On the other hand, the function of punitive damages is not to compensate but to punish the defendant for his wrong. *Id.* We have said,

> "Punitive damages" are not intended to remunerate the injured party for the damages he may have sustained. They are not to compensate; they are the penalty the law inflicts for gross, wanton, and culpable negligence, and are allowed as a warning or as an example to defendants and others. Because they are an example as to what the law will do for such conduct when it results in injury to the person or property of oth-

ers, they are sometimes called exemplary damages.

*Vogler v. O'Neal*, 226 Ark. 1007, 1015, 295 S.W.2d 629, 634 (1956); *see also Vickery v. Ballentine*, 293 Ark. 54, 732 S.W.2d 160 (1987); *Holmes v. Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96 (1961). This court has also recognized that, because compensation of a plaintiff is not the purpose of exemplary or punitive damages, an award may be somewhat of a windfall to him. *Ray Dodge, Inc. v. Moore*, 251 Ark. 1036, 479 S.W.2d 518 (1972).

 That being said, it is also true that punitive damages are dependent upon the recovery of compensatory damages, as an award of actual damages is a predicate for the recovery of punitive damages. *See Elliott v. Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991); *Kroger Grocery & Baking Co. v. Reeves*, 210 Ark. 178, 194 S.W.2d 876 (1946). Moreover, we have observed that the issues of compensatory damages and punitive damages are so interwoven that an error with respect to one requires a retrial of the whole case. *Life & Cas. Ins. Co. of Tenn. v. Padgett*, 241 Ark. 353, 407 S.W.2d 728 (1966). Although compensatory and punitive damages serve differing purposes, an award of punitive damages is nonetheless an integrant part of "the amount recovered for injuries resulting in death or for injuries to persons or property."

 We hold that section 16–55–208 is unconstitutional under article 5, section 32 as it limits the amount of recovery outside the employment relationship. Therefore, we affirm the circuit court's decision. Because we conclude that the statutory cap is unconstitutional on this basis, we need not address the remaining constitutional challenges to the statute.[5]

---

5. Despite the concurring justice's protestations to the contrary, it is without question

that the issue concerning the constitutionality of the statutory cap on punitive damages is

*Johnson v. Rockwell Automation, Inc.,* 2009 Ark. 241, 308 S.W.3d 135.

### III. *Economic–Loss Doctrine*

■ As its second point on appeal, Bayer contends that, because the rice farmers sought only economic losses resulting from its asserted negligence, the circuit court erred in concluding that the rice farmers' claims are not barred by the economic-loss doctrine. The rice farmers counter with the argument that this court has rejected the economic-loss doctrine in the context of strict liability and that we should apply the same rule to claims involving negligence. They also contend that the doctrine has no application where, as here, the contamination caused by Bayer resulted in physical harm to property.

■ In jurisdictions where the economic-loss doctrine finds favor, the rule may bar certain tort claims in three general circumstances: (1) when the loss is the subject matter of a contract; (2) when there is a claim against a manufacturer of a defective product where the defect results in damage only to the product and not to the person or to other property; and (3) when the parties are contractual strangers and there is no accompanying claim for damages to a person or property. *See, e.g., Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.,* 29 S.W.3d 282 (Tex.App.2000). The corollary to the economic-loss doctrine is that the rule does not apply if the plaintiff's economic harm results from physical harm to the plaintiff's person or other property. Dan B. Dobbs, *The Law of Torts* § 609 (2011); *see also In re Genetically Modified Rice Litig.,* 666 F.Supp.2d 1004 (E.D.Mo.2009); *In re StarLink Corn Prods. Liab. Litig.,* 212 F.Supp.2d 828 (N.D.Ill.2002).

As the rice farmers correctly point out, this court has declined to recognize the economic-loss doctrine in cases of strict liability, as we allow the recovery of purely economic losses, even where the damage relates only to the defective product. *Farm Bureau Ins. Co. v. Case Corp.,* 317 Ark. 467, 878 S.W.2d 741 (1994); *Berkeley Pump Co. v. Reed–Joseph Land Co.,* 279 Ark. 384, 653 S.W.2d 128 (1983); *Blagg v. Fred Hunt Co.,* 272 Ark. 185, 612 S.W.2d 321 (1981). Nevertheless, Bayer urges us to extend the doctrine to claims involving negligence. This case, however, does not present the opportunity to decide that question in light of evidence showing phys-

preserved for appeal. In the present case, the constitutional issue was raised via pretrial motion. With regard to such motions, our preservation requirements are simple, straightforward, and well settled. The burden of obtaining a ruling is on the movant; only objections and matters left unresolved are waived and may not be relied upon on appeal. *Stilley v. Univ. of Ark. at Ft. Smith,* 374 Ark. 248, 287 S.W.3d 544 (2008); *Reed v. Guard,* 374 Ark. 1, 285 S.W.3d 662 (2008); *White v. Davis,* 352 Ark. 183, 99 S.W.3d 409 (2003); *Parmley v. Moose,* 317 Ark. 52, 876 S.W.2d 243 (1994). Here, the circuit court conducted a hearing and resolved the motion by issuing a ruling declaring the statute unconstitutional. Our rules require nothing more. If the concurrence were correct in its view, then neither the circuit court's decision

denying the motion in limine to exclude Marsh's testimony nor the court's denial of the motion to dismiss based on the economic-loss doctrine would be preserved for review, because the circuit court also disposed of those motions in rulings from the bench.

In addition, the circuit court's failure to state the basis for its decision is no impediment to our review. Although considered the better practice for a circuit court to explain its decision, findings of fact and conclusions of law are not necessary with regard to decisions on motions. *Stilley v. Fort Smith Sch. Dist.,* 367 Ark. 193, 238 S.W.3d 902 (2006); Ark. R. Civ. P. 52(a). Thus, the circuit court's failure to specify the ground upon which it found the statute unconstitutional does not deter us from performing our duty to review the circuit court's decision.

ical harm to the rice farmers' lands, crops, and equipment.

Robert Cummings, senior vice president of USA Rice Federation, Inc., testified that the contamination was small, but widespread. Rene Van Acker, the rice farmers' liability expert, testified that the contamination of Cheniere was .06% and that the contamination of Clearfield 131 was .01%. Farmer Randall Amaden testified that, with contamination of .06%, a combine harvesting a field would encounter a contaminated plant every two feet. Farmer Neil Daniels and his wife, Betty Daniels, testified as to Neil's efforts to clean his equipment as a result of the contamination. Although the rice farmers chose not to seek compensation for this harm, the evidence is sufficient for us to conclude that the contamination damaged the rice farmers' lands, crops, and equipment. Because the doctrine does not preclude the recovery of economic losses when there is damage to other property, we affirm on this point without addressing whether the doctrine applies in negligence cases.

## IV. *Expert Testimony*

In this argument for reversal, Bayer asserts that the testimony of Jay Marsh, who assessed the rice farmers' damages, was inadmissible because his opinion was not based on scientifically valid methodology. Bayer's complaint focuses only upon Marsh's projection of future damages, and Bayer claims that Marsh calculated those damages in an unscientific manner by taking the past-damages figures and multiplying them by two. The rice farmers respond that Marsh's estimate of future damages was not incompetent because the underpinning for Marsh's projection of future damages was based on standard methodology and because Marsh explained the basis of his opinion that losses would continue in the future.

Rule 702 of the Arkansas Rules of Evidence, which governs expert testimony, states that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *Farm Bureau Mutual Insurance Co. of Arkansas v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), this court adopted the analysis set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under *Foote* and *Daubert*, a circuit court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts in the case. *Coca–Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court set out the objective of *Daubert*'s gatekeeping requirement:

The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert*, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular

expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

■ Our case law provides that we review the admission of expert testimony under an abuse-of-discretion standard. *Crowell v. Barker*, 369 Ark. 428, 255 S.W.3d 858 (2007). In discussing our standard of review for evidentiary rulings, we have said that circuit courts have broad discretion and that a circuit court's ruling on the admissibility of evidence will not be reversed absent an abuse of that discretion. *Advanced Envtl. Recycling Techs., Inc. v. Advanced Control Solutions, Inc.*, 372 Ark. 286, 275 S.W.3d 162 (2008).

With regard to proof of damages, this court has stated that a plaintiff must present proof that would enable the jury to fix damages in dollars and cents, and damages will not be allowed which are speculative, resting only upon conjectural evidence or the opinion of the parties. *Carr v. Nance*, 2010 Ark. 497, 370 S.W.3d 826; *Mine Creek Contractors, Inc. v. Grandstaff*, 300 Ark. 516, 780 S.W.2d 543 (1989). But this court has also stated that in those instances where damages simply cannot be proven with exactness, when the cause and existence of damages have been established by the evidence, recovery will not be denied merely because the damages cannot be determined with exactness. *Carr, supra.*

In his testimony, Marsh, who is an economic and financial analyst, a certified public accountant, an attorney, and an engineer, testified that his analysis revealed the existence of a linear relationship between the prices of world rice and Arkansas rice. He stated that, based on this linear relationship, he calculated past losses using what is known as the classical ordinary-least-squares regression model.

Marsh said that this model was commonly used in the field of economic forecasting and that it was the standard by which all other models are judged. He stated that the model showed that, while the price of Arkansas rice had increased, the price had lagged behind the world price and did not increase as much as it should have. His opinion, based on the model, was that the lagging price of Arkansas rice was attributable to the contamination of the rice supply with LLRice. Marsh assessed the rice farmers' damages for a period beginning with the USDA announcement on August 18, 2006, and ending on July 31, 2008. Marsh testified that he estimated past damages during this period by calculating the difference between the prices at which people sold rice in Arkansas and the prices they should have been able to obtain but for the contamination. In forecasting future damages, Marsh predicted, after consulting the data and considering influences such as imports, exports, tariffs, and foreign exchange rates, that the negative price differential for Arkansas rice would continue for an extended period of time. In assessing future damages, Marsh said that he used the scientifically based numbers of past damages and multiplied them by two and then made adjustments for each farmer based on future growing plans. Marsh stressed that his estimates of future losses, as lasting only two years, were conservative, saying, "Knowing what the model has predicted over the past three years and knowing that there's been no change in the economic data, that represents, in my opinion, the minimal future loss."

■ In this case, Marsh based his estimates of future damages on his calculations of past damages, which Bayer does not contend are unreliable. Marsh used those past-damages figures to extrapolate future losses, based on his judgment that

the price of Arkansas rice would continue to lag behind the world price for a minimum of two years. Marsh thus explained the bases for his opinions. Any weakness in the factual underpinning of an expert's opinion may be explored on cross-examination, and such a weakness goes to the weight and credibility of the expert's testimony. *House v. Volunteer Transp., Inc.,* 365 Ark. 11, 223 S.W.3d 798 (2006); *SEE-CO, Inc. v. Hales,* 341 Ark. 673, 22 S.W.3d 157 (2000). Bayer had the opportunity to test Marsh's opinions with cross-examination, and it presented the testimony of its own expert, Walter Thurman, to critique Marsh's analyses. Our conclusion here is that Bayer's criticisms go to the weight but not to the admissibility of Marsh's opinions, and we hold that the circuit court did not abuse its discretion by allowing the testimony.

## V. *Punitive Damages*

In this issue, Bayer presents two arguments for our consideration. First, Bayer contends that the circuit court erred by submitting the issue of punitive damages to the jury. Second, Bayer argues that the amount of punitive damages awarded is excessive under Arkansas common law and federal due-process standards.

## A. Directed Verdict

Bayer's contention on this point is that it was entitled to a directed verdict as a matter of law because the undisputed evidence demonstrates that it took steps to guard against the risk of an accidental release of genetically altered rice. Bayer states that it established a stewardship program to achieve compliance with federal regulations; that it created compliance notebooks to instruct those conducting field tests regarding containment measures; and that it required those handling LLRice to sign a contract of compliance to verify adherence to the guidelines in the notebooks. Bayer asserts that, under Arkansas law, it cannot be subjected to an award of punitive damages as long as it exercised some level of care, as opposed to an "absence of all care."

Bayer derives this argument from our decision of *National By–Products, Inc. v. Searcy House Moving Co.,* 292 Ark. 491, 731 S.W.2d 194 (1987). There, we noted that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. In defining wantonness and conscious indifference to the consequences, we said,

Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character, such conduct as manifests a "disposition of perversity." Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of danger, with indifference to consequences and *with absence of all care.*

It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff.

*Nat'l By–Products, Inc.,* 292 Ark. at 494, 731 S.W.2d at 195–96 (quoting *Ellis v. Ferguson,* 238 Ark. 776, 778–79, 385 S.W.2d 154, 155 (1964)) (emphasis added). We repeated this definition in *Alpha Zeta Chapter of Pi Kappa Alpha v. Sullivan,* 293 Ark. 576, 740 S.W.2d 127 (1987).

■ Bayer would have us view the phrase "with absence of all care" in isolation and as an absolute requirement for a punitive-damage award. We do not agree with this assertion. The fact that Bayer employed some measures to prevent the release of LLRice, standing alone and without regard to other facts and attending circumstances, does not absolve it of liability for punitive damages. Rather, the critical inquiry is whether a party likely knew or ought to have known, in light of the surrounding circumstances, that his conduct would naturally or probably result in injury, and that he continued such conduct in reckless disregard of the consequences from which malice could be inferred. *See Union Pac. R.R. Co. v. Barber*, 356 Ark. 268, 149 S.W.3d 325 (2004) (citing *In re Aircraft Accident at Little Rock*, 351 F.3d 874 (8th Cir.2003)). Bayer does not contest the jury's resolution of those factual issues. Thus for the reasons explained, the circuit court did not err by rejecting Bayer's legal argument advanced in its motion for a directed verdict.

### B. Excessiveness of the Award

■ As its final point, Bayer contends that the jury's award of $42,000,000 is grossly excessive. Punitive damages are reviewed by our courts in a two-step process: first, whether the award is consistent with state law; and second, whether it violates the Due Process Clause, as analyzed by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, 376 S.W.3d 414. We have set forth the following law related to remittitur and punitive damages in the context of state common-law analysis:

> When considering the issue of remittitur of punitive damages ... [w]e consider the extent and enormity of the

wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent to injure another. When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. It is important that the punitive damages be sufficient to deter others from comparable conduct in the future.

*Advocat, Inc. v. Sauer*, 353 Ark. 29, 50, 111 S.W.3d 346, 357–58 (2003) (citations omitted) (quoting *Routh Wrecker Serv. v. Washington*, 335 Ark. 232, 240–41, 980 S.W.2d 240, 244 (1998)).

In *BMW of North America v. Gore*, *supra*, the United States Supreme Court set forth three guideposts to consider in determining whether a punitive-damages award is excessive under federal law: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive-damages award, also expressed as the ratio between compensatory and punitive damages; and (3) the difference between the punitive award and comparable civil penalties authorized or imposed in comparable cases. *Dodson, supra.*

We are not able to address Bayer's arguments concerning the excessiveness of the punitive-damage award because this issue is not preserved for appeal. Bayer's arguments challenging the amount of punitive damages were made only in its posttrial motion for new trial and remittitur. The circuit court did not take action on

this motion within the thirty-day window allowed by Rule 4(b)(1) of the Arkansas Rules of Appellate Procedure–Civil, and in accordance with this rule, the motion was deemed denied at the expiration of the thirty-day period. Each Bayer defendant filed separate but identical notices of appeal giving "notice of its appeal to the Arkansas Supreme Court from the Court's judgment entered on May 5, 2010." None of the notices of appeal mention that an appeal was being sought from the deemed-denial of the motion for new trial and remittitur.

Our rule states that a notice of appeal "shall designate the judgment, decree, order or part thereof appealed from." Ark. R.App. P.-Civ. 3(e)(ii). In *Tate–Smith v. Cupples*, 355 Ark. 230, 134 S.W.3d 535 (2003), we noted that, when a motion for a new trial has been deemed denied, the only appealable matter is the original order and that any previously filed notice of appeal may be amended to appeal from the deemed-denied motion. In *U.S. Bank, N.A. v. Milburn*, 352 Ark. 144, 100 S.W.3d 674 (2003), this court indicated that a notice of appeal should be filed in order to appeal from the denial of a posttrial motion for reconsideration. We have also recognized that a notice of appeal must be "judged by what it recites and not what it was intended to recite." *Thelman v. State*, 375 Ark. 116, 119, 289 S.W.3d 76, 78 (2008) (citing *Ark. Dep't of Human Servs. v. Shipman*, 25 Ark. App. 247, 253, 756 S.W.2d 930, 933 (1988)). In this case, Bayer did not state in the notice of appeal that it was appealing the denial of the posttrial motion for new trial and remittitur. Therefore, the question of the excessiveness of the jury's award is not properly before us. *See, e.g., Vibo Corp. v. State ex rel. McDaniel*, 2011 Ark. 124, 380 S.W.3d 411.

Affirmed.

BAKER, J., concurs.

KAREN R. BAKER, Justice, concurring.

While I agree with the outcome of the case, because I would not reach the constitutional issue on this matter, I must concur.

The circuit court in this case ruled on the constitutional issue from the bench and entered no written opinion in regard to it. This is not enough to preserve a constitutional matter for appeal.

Although the circuit court ruled on this issue from the bench, the final, written order did not address this issue. In a case where the judge made a constitutional decision from the bench, we stated, "Pursuant to Administrative Order 2(b)(2), an oral order announced from the bench does not become effective until reduced to writing and filed." When the circuit court makes no ruling on an issue, the appellate court is precluded from reaching the issue on appeal.

*Boellner v. Clinical Study Ctrs., LLC*, 2011 Ark. 83, 23, 378 S.W.3d 745, 759–60 (citations omitted) (quoting *Oliver v. Phillips*, 375 Ark. 287, 290 S.W.3d 11 (2008)). *See also McGhee v. Ark. State Bd. of Collection Agencies*, 368 Ark. 60, 243 S.W.3d 278 (2006) (refusing to address the constitutionality of the Check–Cashers' Act where no written order was entered following the trial court's ruling from the bench that the act was unconstitutional); *Ghegan & Ghegan, Inc. v. Barclay*, 345 Ark. 514, 49 S.W.3d 652 (2001) (refusing to address constitutional issue even when the order generally addresses the matter but fails to make a specific ruling on the constitutionality of a statute).

Further, because the circuit court's oral ruling from the bench provided only that, "the Court finds that the statute is unconstitutional," we do not know which of the

two grounds put forth by appellees the court found to be persuasive. Without knowing why the court ruled on an issue, we are unable to review that decision for error. For that reason, this court promulgated Administrative Order No. 2. Without a written order, we are forced to speculate on the reason behind the trial court's ruling and then to usurp the role of the trial court in declaring why Arkansas Code Annotated section 16–55–208 is unconstitutional.

Because the Bayer defendants waived the point by not filing a motion for clarification of the circuit court's ruling or a motion seeking additional findings of fact and conclusions of law under Arkansas Rule of Civil Procedure 52, I agree with the majority's outcome on the matter. However, because the constitutional matter is not preserved for appeal, I concur.