2013 Ark. 115

**Amanda Marie SCUDDER, Appellant**

v.

**Raylinia RAMSEY, Appellee.**

No. 12–476.

Supreme Court of Arkansas.

March 14, 2013.

 

Melikian Law Firm, by: Scarlett R. Melikian, for appellant.

James A. McLarty, III, Newport; and Robert S. Tschiemer, Mayflower, for appellee.

COURTNEY HUDSON GOODSON, Justice.

Appellant Amanda Marie Scudder appeals the order entered by the Jackson County Circuit Court finding her in contempt and denying her motion to terminate the grandparent-visitation rights of appellee Raylinia Ramsey to P.S., Amanda's daughter. The circuit court also awarded Raylinia $4,417.95 in attorney's fees and costs. For reversal, Amanda contends that the circuit court erred by not terminating Raylinia's grandparent-visitation rights upon Amanda's adoption, by finding her in contempt, and by awarding attorney's fees and costs to Raylinia. We granted Raylinia's motion to transfer the appeal to this court from the court of appeals, as this case involves significant issues of statutory construction and an issue of first impression. Therefore, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(b)(1) & (6). We reverse the circuit court's decision declining to terminate visitation; we affirm the finding of contempt; and we reverse and remand the award of attorney's fees and costs.

## Factual Background

Amanda is Raylinia's adult biological daughter. The record reflects that their relationship has been punctuated by periods of estrangement. In 2006, when Amanda was fifteen years old, she left the home of Raylinia and her husband, and the Third Division of the Jackson County Circuit Court, Judge Kevin King presiding,

placed Amanda in the custody of Shane O'Banion, Raylinia's second cousin, and his wife, Melanie. Amanda and Raylinia had no contact with one another until Amanda graduated from high school. Subsequently, Amanda, who was unmarried at the time, gave birth to a daughter, P.S., on March 9, 2010. When the child was born, Amanda and Raylinia were enjoying a period of relative harmony, only to fall into discord six months later. In September 2010, Amanda petitioned the Jackson County Circuit Court for a protective order against Raylinia. This case was also assigned to Judge King, who ultimately entered an agreed, mutual-restraining order prohibiting Amanda and Raylinia from harassing and contacting one another.

On November 22, 2010, Raylinia filed a petition in the Circuit Court of Jackson County to establish grandparent visitation with P.S., pursuant to Arkansas Code Annotated section 9–13–103(b)(2) (Repl.2009). This matter was assigned to Judge Philip G. Smith in the Second Division. Judge Smith held a hearing on February 7, 2011, and by an order dated February 22, 2011, he granted Raylinia's petition for grandparent visitation. Pursuant to the order, Raylinia was to exercise visitation while Amanda was at work on weekdays during the hours of 4:45 p.m. to 7:45 p.m. and on Saturdays from 8:15 a.m. to 1:15 p.m. and from 4:45 p.m. to 7:45 p.m. The order also provided that, if Amanda changed employment or altered her work schedule, visitation would take place on alternating weekends from Saturday at 9:00 a.m. to 5:00 p.m. on Sunday. Exchanges of the child were to occur at the Jackson County Sheriff's Office. Amanda chose not to appeal this order.

On February 23, 2011, Melanie and Shane O'Banion filed a petition in the Circuit Court of Jackson County seeking to adopt Amanda. The adoption petition was assigned to Judge King. On March 3, 2011, Raylinia filed a motion for contempt in the visitation action before Judge Smith, who scheduled a hearing on April 4, 2011. In this motion, Raylinia alleged that Amanda had denied visitation on two occasions. Upon Amanda's motion, Judge Smith continued the contempt matter. It is undisputed that Raylinia was not made aware of the pending adoption.

On April 18, 2011, Judge King entered a decree for the adoption of Amanda by the O'Banions. It is also undisputed that Judge King had not been made aware of Raylinia's visitation rights with P.S. at the time he granted the adoption. Three days after the adoption, Amanda filed a motion before Judge Smith to terminate Raylinia's visitation rights with P.S. Amanda argued that Raylinia's visitations rights with P.S. were derived from her relationship as a biological grandmother. She asserted that her adoption by the O'Banions severed this relationship and that Raylinia was no longer a grandparent entitled to visitation under section 9–13–103(b)(2).

On July 18, 2011, Judge Smith heard both Raylinia's motion for contempt and Amanda's motion to terminate visitation. At the hearing, Raylinia testified that Amanda had denied her visitation on Friday, February 25, 2011, because Amanda claimed that Raylinia did not have an appropriate car seat for the child. Raylinia stated that Amanda refused her offer to immediately purchase a new car seat and that Amanda would not allow her to borrow Amanda's car seat. She said that Amanda also refused visitation on Saturday, February 26. Raylinia testified that she missed visitation the following Monday to attend a funeral, but she stated that Amanda did not permit visitation for the rest of that week. Raylinia said that the order allowed visitation while Amanda was working and that she observed Amanda's

vehicle at her place of employment during that week. Raylinia testified that, over the weekend, she and Amanda agreed that she would exercise visitation on alternating weekends from Saturday morning at 9:00 until Sunday evening at 5:00. She said that her visits had been consistent from that time forward and that she had also received one extra visit when Amanda asked her to keep P.S.

Raylinia further testified that Amanda frequently babysat for the O'Banions before she began living with them in 2006. She acknowledged that Amanda referred to them as "mom" and "dad" and that Amanda considered the O'Banions' children as her siblings.

In her testimony, Amanda explained that she wanted the O'Banions to adopt her because they had taken care of her and had acted as her parents since age fifteen when Raylinia kicked her out of the house. She testified that extinguishing Raylinia's rights as a grandparent of P.S. was not the full purpose for the adoption, but she admitted that it was one of the reasons for pursuing the adoption. Amanda stated that she no longer wanted a relationship with Raylinia and did not want Raylinia to be her mother. Amanda described their relationship as "rocky," and she testified that they parted ways in September 2010 when Raylinia physically attacked her during an argument concerning Amanda's removal of Raylinia from her Facebook page.

Amanda acknowledged that she did not allow Raylinia to visit with P.S. on February 25, 2011, because Raylinia's car seat was too small. She believed that, based on the language of the order, Raylinia was not to have visitation the next day and the following week because her work schedule had changed. Amanda testified that, because of the change in her working hours, they agreed to weekend visitation as stat-ed in the order. Amanda said that she had been compliant with the order ever since.

Melanie O'Banion testified that Amanda lived with her family through high school and that she left their home after a disagreement over a phone bill. Melanie said that she and her husband petitioned to adopt Amanda because they loved her and had acted as her parents, even after Amanda had moved out of their home. She testified that the adoption was "absolutely sincere" and that "she's been mine since she was fifteen years old." Melanie recalled that Raylinia told Judge King in 2006 that she did not want Amanda anymore. She spoke of Raylinia as being abrasive and hostile and said that Raylinia's home had not been a happy place for Amanda.

After the hearing, Judge Smith took both motions under advisement. A few days later, Raylinia's counsel informed the court of his intent to file a petition to set aside the adoption. Consequently, Judge Smith delayed ruling on the motions for contempt and for termination of visitation rights, pending the outcome of the adoption matter. On October 24, 2011, Judge King set aside the adoption decree and held a hearing to give Raylinia the opportunity to be heard. That same day, Judge King entered an order granting the O'Banions' petition to adopt Amanda. In the adoption decree, dated November 22, 2011, Judge King stated that he "gave due consideration to the effect that this Decree of Adoption will have on Raylinia Ramsey's grandparent visitation rights with Amanda Scudder's daughter."

Thereafter, Judge Smith conducted a brief status hearing. On February 14, 2012, Judge Smith issued a memorandum opinion setting forth his decision. After recounting the facts, he held Amanda in contempt on two grounds. The judge

found that Amanda had actively participated in the adoption for the purpose of avoiding compliance with the visitation order and that she also had unreasonably denied visitation because she disagreed with the court's decision. As a result, Judge Smith sentenced Amanda to thirty days in jail, suspended upon her strict compliance with the visitation order. He also stated that he would award Raylinia costs and attorney's fees. Further, Judge Smith denied Amanda's motion to terminate visitation. In so ruling, the judge recognized that, pursuant to Arkansas Code Annotated section 9–9–215(a)(1) (Supp. 2011), the adoption terminated the legal relationships among Amanda and her biological relatives. In reference to Arkansas Code Annotated section 9–9–223 (Repl. 2009), he found that the adoption decree did not specifically terminate Raylinia's visitation rights. Judge Smith then reasoned that Raylinia's visitation rights were established by court order that preceded the adoption decree and that the adoption decree contained no finding terminating those rights. Thus, the judge ruled that the court-ordered visitation rights were not automatically terminated by the adoption.

Amanda filed a motion for reconsideration, challenging the circuit court's findings and conclusions of law. On March 22, 2012, the circuit court entered its order incorporating the decision set out in its memorandum opinion. In this order, the court awarded Raylinia costs and attorney's fees in the amount of $4,417.95, payable within 120 days. This appeal followed.

*Termination of Visitation Rights*

■■■ As her first point on appeal, Amanda contends that the circuit court erred by not terminating Raylinia's grandparent-visitation rights. She asserts that Raylinia's rights in P.S. were derivative of the mother-daughter relationship between her and Raylinia, and Amanda argues that the adoption decree severed all rights and legal relations between them, including Raylinia's visitation rights. Amanda also asserts that the circuit court misapplied section 9–9–223. Further, she contends that the adoption and resulting severance of the biological mother-daughter relationship constitutes a material change in circumstances, and she argues that termination of Raylinia's visitation rights was in the best interest of the child.[1]

■■■ The issues raised on appeal require us to construe the relevant statutes. The question of the correct application and interpretation of an Arkansas statute is a question of law, which this court decides de novo. *Broussard v. St. Edward Mercy Health Sys., Inc.*, 2012 Ark. 14, 386 S.W.3d 385. The basic rule of statutory construction to which all interpretive guides must yield is to give effect to the intent of the General Assembly. *Falcon Cable Media LP v. Ark. Pub. Serv. Comm'n*, 2012 Ark. 463, 425 S.W.3d 704. When reviewing issues of statutory interpretation, we are mindful that the first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning. *Voltage Vehicles v. Ark. Motor Vehicle Comm'n*, 2012 Ark. 386, 424 S.W.3d 281.

---

1. Citing *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), Amanda also raises the argument that the circuit court erred by failing to accord a presumption in favor of her request to cease visitation. However, she did not argue below that she was entitled to such a presumption in the proceeding to terminate established visitation rights. It is well settled that this court will not consider arguments raised for the first time on appeal. *In re Guardianship of S.H.,* 2012 Ark. 245, 409 S.W.3d 307.

This court has stated that any rights existing in grandparents must be derived from statutes. *In re Adoption of Tompkins,* 341 Ark. 949, 20 S.W.3d 385 (2000); *Vice v. Andrews,* 328 Ark. 573, 945 S.W.2d 914 (1997). Our grandparent-visitation statute provides in relevant part that a grandparent may petition a circuit court for reasonable visitation rights with respect to her grandchild if the child is illegitimate and the petitioner is the maternal grandparent of the illegitimate child. Ark.Code Ann. § 9–13–103(b)(2). Even as grandparent-visitation rights have been articulated by statutory expressions of public policy, so also have there been statutory declarations of public policy favoring the rights of an adoptive family over the interests of biological relatives. *Vice, supra.* With exceptions not applicable here,[2] section 9–9–215(a)(1) provides that the effect of a final decree of adoption is to "terminate all legal relationships between the adopted individual and his or her biological relatives, including his or her biological parents, so that the adopted individual thereafter is a stranger to his or her former relatives for all purposes." Additionally, a final decree creates "the relationship of parent and child between the petitioner and the adopted individual, as if the adopted individual were a legitimate blood descendant of the petitioner[.]"

This court has made clear that a grandparent's rights are derivative of his or her son's or daughter's parental rights. *Suster v. Ark. Dep't of Human Servs.,* 314 Ark. 92, 858 S.W.2d 122 (1993); *see also Henry v. Buchanan,* 364 Ark. 485, 221 S.W.3d 346 (2006); *Vice, supra.* Based on this principle and section 9–9–215(a)(1), we have held that, when a natural parent consents to the adoption of a child by another person, the consenting parent's relatives lose their legal rights to visitation because such rights are derivative of the consenting parent's rights and likewise are terminated when parental rights are ended. *Vice, supra.* In commenting on the effect of an adoption, we have said that it is "unquestionably within the province of the legislature to decide that the reasons favoring the solidarity of the adoptive family outweigh those favoring grandparents and other blood kin who are related to the child[.]" *Wilson v. Wallace,* 274 Ark. 48, 50, 622 S.W.2d 164, 166 (1981); *see also Poe v. Case,* 263 Ark. 488, 565 S.W.2d 612 (1978) (observing the strong public policy expressed in the adoption statutes to strengthen the relationship between an adopted child and his or her adoptive family and to terminate the previous family relationship). We have also held that, when a son's or daughter's parental rights in a child are terminated in a dependency-neglect proceeding, the derivative rights of the grandparent to visitation with the child are also extinguished. *Suster, supra.*

We have not had the opportunity to address the effect of an adoption on the visitation rights of a grandparent where, as here, the individual adopted is the adult daughter of the grandparent who enjoys visitation with the offspring of the daughter. Thus far, our cases have dealt with the more typical situation involving the severance of grandparent-visitation rights when parental rights are terminated or where the offspring of a parent is adopted. *See Vice, supra; Suster, supra.* However, section 9–9–215(a)(1) and our caselaw applying the statute portend that a grand-

---

2. The exceptions include the spouse of the petitioner in a stepparent adoption. Ark. Code Ann. § 9–9–215(a)(1). The statute also grants visitation rights to parents of a biological parent who dies before the petition for adoption is filed. *Id.* In addition, sibling visitation in certain cases may continue following an adoption under the circumstances specified in section 9–9–215(c).

parent's visitation rights are also extinguished in the situation before us, as the rationale is the same. Here, the grandmother's visitation rights are derived from her biological daughter because they spring from her relationship as the maternal grandmother of the child, pursuant to section 9–13–103(b)(2). Upon the daughter's adoption, section 9–9–215(a)(1) effects the termination of "all legal relationships between the adopted individual and his or her biological relatives," such that they are "strangers ... *for all purposes.*" This effect of an adoption "[i]ncludes ... the interpretation or construction of ... statutes[.]" Ark.Code Ann. § 9–9–215(a)(1). It must follow that the grandmother's derivative rights of visitation are lost upon her daughter's adoption. Simply put, the biological grandmother becomes a stranger who is no longer entitled to visitation under the grandparent-visitation statute as a result of adoption. That the visitation rights preceded the adoption is of no moment because the adoption severed that right by operation of law, just as in cases involving the termination of parental rights or the adoption of a parent's offspring. *See Suster, supra; Vice, supra.*

The circuit court also reasoned that the court presiding over the adoption did not specifically terminate Raylinia's visitation rights in the adoption decree. This statement made by the court stems from section 9–9–223,[3] which provides as follows:

> Except as provided in this subchapter with regard to parental rights, any rights to a child which a nonparental relative may derive through a parent or by court order may, if the best interests of the child so require, be terminated in

connection with a proceeding for adoption or for termination of parental rights.

Contrary to the circuit court's reasoning, this statute does not diminish the effect of an adoption on established visitation rights as provided in section 9–9–215. By its plain language, section 9–9–223 merely grants a court in an adoption proceeding the authority to terminate visitation rights granted by another court. However, we agree with Amanda that section 9–9–223 does not apply in this situation. The adoption code defines "child" as a son or daughter, whether by birth or by adoption. Ark. Code Ann. § 9–9–202(2) (Repl.2009). The "child" referred to in the statute is the *adopted* child, which is Amanda, not P.S. Because the visitation rights in this case involve P.S., the statute is not applicable here.

In accordance with section 9–9–215(a)(1), we hold that Amanda's adoption terminated Raylinia's visitation rights in P.S. Accordingly, the circuit court erred by continuing to recognize Raylinia's visitation rights following the adoption. In light of this holding, we need not consider Amanda's alternative argument that a material change in circumstances occurred such that continuing visitation was no longer in the child's best interest.

*Contempt and Attorney's Fees*

Amanda asserts that the circuit court erred in finding that she was in contempt of court and in imposing the sanctions of incarceration and attorney's fees and costs. She contends that the court erred in finding that she willfully denied visitation, and she argues that she cannot be held in contempt for exercising her legal right to

<hr>

**3.** Amanda maintains that this statute may be unconstitutional because it does not give a presumption in favor of a fit parent's rights. This argument was not raised below. It is well settled that this court will not address an issue raised for the first time on appeal, even a constitutional argument. *Bayer CropScience LP v. Schafer,* 2011 Ark. 518, 385 S.W.3d 822.

consent to an adoption. Further, she contends that the circuit court erred by awarding Raylinia attorney's fees, in particular, fees for legal services rendered by her attorney in connection with the adoption case.

The disobedience of any valid judgment, order, or decree of a court having jurisdiction to enter it may constitute contempt. *Guffey v. Counts,* 2009 Ark. 410, 2009 WL 2971752; *Gatlin v. Gatlin,* 306 Ark. 146, 811 S.W.2d 761 (1991). However, before one can be held in contempt for violating the court's order, the order must be definite in its terms and clear as to what duties it imposes. *Terry v. White,* 374 Ark. 366, 288 S.W.3d 194 (2008); *Omni Holding & Dev. Corp. v. C.A.G. Invs., Inc.,* 370 Ark. 220, 258 S.W.3d 374 (2007). Contempt is divided into criminal contempt and civil contempt. *Johnson v. Johnson,* 343 Ark. 186, 33 S.W.3d 492 (2000). The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Id.* By comparison, civil contempt proceedings are instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders made for the benefit of those parties. *Ark. Dep't of Human Servs. v. R.P.,* 333 Ark. 516, 970 S.W.2d 225 (1998). The contempt in this case was civil, not criminal. The award of attorney's fees and costs was for the benefit of Raylinia and was thus remedial in nature. *Ark. Dep't of Health & Human Servs. v. Briley,* 366 Ark. 496, 237 S.W.3d 7 (2006). Although Amanda was sentenced to a term in jail, the contempt was nonetheless civil because she was provided the mechanism by which she could purge the contempt, i.e., maintaining strict compliance with the visitation order. *Id.* The standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Hunt v. Perry,* 357 Ark. 224, 162 S.W.3d 891 (2004).

Amanda maintains that the circuit court's finding that she willfully denied visitation is contrary to the evidence. She asserts that she complied with the visitation order after the first week and that she refused visitation only one time when Raylinia allegedly did not have an appropriate car seat. We find no merit in this argument. The order granted Raylinia visitation while Amanda was at work on weekdays from 4:45 p.m. to 7:45 p.m. The order permitted alteration of the schedule to weekend visitation should Amanda's working hours change. The testimony established that Raylinia did not receive visitation on the Friday or Saturday after the visitation order was entered and that she was denied scheduled visits the following week. Although Amanda testified that her work schedule had changed, Raylinia testified that she observed Amanda's car at work during the hours when visitation was to occur. In contempt proceedings, the judge determines the credibility of witnesses. *Ivy v. Keith,* 351 Ark. 269, 92 S.W.3d 671 (2002). Based on Raylinia's testimony, which the circuit court found credible, we cannot say that the circuit court's finding of contempt is clearly against the preponderance of the evidence. Because we affirm the circuit court's finding of contempt on this basis, we need not decide whether the court erred by holding Amanda in contempt for participating in the adoption proceeding.

With regard to attorney's fees, as a general rule, such fees are not allowed in the absence of a statute permitting their allowance. *Artman v. Hoy,* 370 Ark. 131, 257 S.W.3d 864 (2007). However, we have recognized that it is within the inherent power of a court to allow attorney's fees in certain matters not specifically cov-

ered by statute, including contempt proceedings. *Gavin v. Gavin,* 319 Ark. 270, 890 S.W.2d 592 (1995), *overruled on other grounds by Hartford Fire Ins. Co. v. Sauer,* 358 Ark. 89, 186 S.W.3d 229 (2004); *Feazell v. Feazell,* 225 Ark. 611, 284 S.W.2d 117 (1955). The decision to award fees and the amount thereof are matters within the discretion of the circuit court. *Baber v. Baber,* 2011 Ark. 40, 378 S.W.3d 699.

Here, the circuit court awarded Raylinia $4,417.45 in attorney's fees and costs. We find no abuse of discretion in the decision to award fees. However, we agree with Amanda that a portion of the attorney's fee cannot stand. A review of the time sheet shows that counsel included hours devoted to the adoption proceeding. As we noted, the circuit court has the authority to award fees in the contempt matter. However, that authority does not extend to fees incurred in separate litigation. Therefore, the circuit court abused its discretion in the amount of fees awarded, and we reverse and remand on that issue.

Affirmed in part; reversed in part; reversed and remanded in part.

HART, J., concurs in part and dissents in part.

JOSEPHINE LINKER HART, Justice, concurring in part and dissenting in part.

I disagree that Ms. Scudder's adult adoption is legally and factually conclusive in this case. In my view, the majority has interpreted Arkansas Code Annotated section 9–9–215 far too broadly. While the plain wording of the statute certainly affects all the legal relationships where *Ms. Scudder* is concerned, I cannot agree that its proper application affects the status of P.S., who is a person in her own right. While it may be a legal fact that Ms.

Ramsey is no longer Ms. Scudder's legal mother, it is a biological fact that Ms. Ramsey is, and will always be, P.S.'s biological grandmother. I am aware that this court has diminished the importance of a biological link to a child by its decisions in *Bethany v. Jones,* 2011 Ark. 67, 378 S.W.3d 731, and *Robinson v. Ford–Robinson,* 362 Ark. 232, 208 S.W.3d 140 (2005). However, I find it completely untenable that this court has today announced that it is wholly irrelevant under the law.

Also troubling is the majority's decision to completely ignore our standard of review in this visitation case. I find myself echoing the concern expressed by Justice Danielson in his dissent in *Daniel v. Spivey,* 2012 Ark. 39, 386 S.W.3d 424, that the majority has completely ignored "our even greater deference to the circuit courts in cases involving child custody or visitation." I likewise find it troubling that this court, with its superintending authority over the trial courts of this state would countenance a collateral attack on a visitation order by another division of the Jackson County Circuit Court.

I concur with the majority to the extent that they find error in the trial court's decision to reject Ms. Scudder's challenge to Ms. Ramsey's grandparent visitation. In my view, while not conclusive, Ms. Scudder's adult adoption proceeding did constitute a material change in circumstances. Accordingly, I would reverse and remand this case for the trial court to consider the best interest of the child in regard to visitation in light of the current circumstances.