Cite as 2025 Ark. App. 524

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-24-534

JOSHUA JUDKINS

APPELLANT

V.

KAYLA JUDKINS

APPELLEE

Opinion Delivered October 29, 2025

APPEAL FROM THE SALINE
COUNTY CIRCUIT COURT
[NO. 63DR-22-268]

HONORABLE BRENT DILLON
HOUSTON, JUDGE

AFFIRMED IN PART; MODIFIED IN
PART; REVERSED AND REMANDED
IN PART

**MIKE MURPHY, Judge**

Appellant Joshua Judkins appeals from the decree of divorce entered by the Saline County Circuit court divorcing him from appellee Kayla Judkins. His arguments on appeal are that the circuit court erred when it awarded Kayla primary custody of their minor child and in holding him in contempt. We affirm the award of custody, but we agree with Joshua that there are issues surrounding the contempt and therefore reverse and remand the same.

Joshua and Kayla were married in January 2019 and divorced by decree of the Saline County Circuit Court in April 2024. The parties have one child together, MC, who was born in 2015. Kayla filed for divorce on March 29, 2022, and the following two years during which the divorce was pending were filled with acrimony and litigation.

Pertinent to this appeal, during their separation leading up to the divorce, the parties shared true week-on-week-off joint custody of MC pursuant to a temporary order entered June 29, 2022. That order also required Joshua to pay Kayla $113 a month in child support and to deposit the parties' income tax refund into the court's registry.

On December 20, 2022, Kayla filed a motion for contempt alleging that Joshua had not deposited the income tax refund into the court's registry, was behind on child support, was interfering with her visitation with MC, and was harassing her. Shortly thereafter, on December 28, the parties entered into a memorandum of understanding (MOU) through mediation. The MOU maintained the weekly joint-custody arrangement and outlined some additional details clarifying typical custodial logistics, like pick-ups, drop-offs, and holidays. Under the MOU, the parties also shared legal custody, which was specifically defined to mean shared and equal access to MC's school, medical, and similar records. Kayla was designated the final decision maker for educational issues, and Joshua the final decision maker for medical decisions. It was signed by the parties, their attorneys, and the attorney ad litem and filed with the court.

On January 6, 2023, the court entered an order that, among other things, ordered Joshua to pay the tax refund into the registry of the court within ten days, and if he was "not making child support payments, he [was] Ordered to start paying immediately."

On March 20, Kayla filed another motion for contempt alleging several instances in which Joshua significantly interfered with visitation and that he was still behind on child support.

On July 19, Kayla moved to set aside the MOU, alleging that it was not in the best interest of MC and that Joshua had not followed it. Alternatively she asked that it not be incorporated into the divorce decree.

A final divorce hearing was held on April 18, 2024. Kayla testified that Joshua did not deposit the entire amount of the tax refund into the court's registry or start paying child support when ordered as part of the temporary order. She said that it was not until the court's January 2023 order that he did either. Presently, he was $293.80 past due on child-support payments.

Concerning custody and visitation, Kayla testified to several instances in which Joshua was difficult or interfered with her visitation. She testified about one instance, around Christmas 2022, when Joshua would not bring MC to the scheduled exchange. She further testified that, on several occasions during her custodial weeks, Joshua checked MC out of school and did not return him, forcing Kayla to meet later for an exchange. On one occasion, Kayla specifically asked Joshua not to check MC out for lunch because she planned to visit him at school; however, when she arrived, MC had already been checked out and was not there.

Kayla also testified about spring break in 2023. It was Joshua's year to have MC for spring break. Joshua took MC out of state but would not tell Kayla where they were going. The following spring break was supposed to be Kayla's, but Joshua threatened to not "let" Kayla have MC unless she provided him a paper copy of a calendar she had already shared with him electronically. Kayla testified that Joshua enrolled MC in therapy but refused to

3

disclose the therapist's name. She further stated that Joshua would manipulate summer vacations to have MC three weeks in a row (Kayla did not retaliate by trying to do the same thing "back"). On another occasion, Joshua threatened litigation unless his two older daughters (from another relationship) were permitted to visit MC during Kayla's visitation time.

Kayla next described a situation in June 2023 when she was trying to pick MC up for the start of her summer visitation, and instead of making MC available, Joshua scheduled an activity for MC to do that day. When Kayla went to meet them at the activity, Joshua shoved Kayla out of the elevator, and when Kayla went to physically pick MC up, Joshua "grabbed" MC out of her arms. Kayla called security to help; the responding security officer was Seargent Dustin Hamm, a police officer who worked security for the building when he was off duty policing.

The following August, Kayla learned that the school district had rezoned some of the schools. Previously, both her and Joshua's homes were zoned for the same elementary school, but after the rezoning that was no longer the case. Kayla, who had final say in educational decisions under the MOU, decided she wanted MC to attend the school that corresponded to her address. When Joshua found out, he unilaterally changed MC's school to the one assigned to his own address. When asked if she thought that the MOU could be modified to incorporate her concerns, Kayla replied "No. Josh manipulates wording every step of the way. There's nothing that you could put on paper that he would follow. Not just with [MC], with anything."

Kayla called Seargeant Dustin Hamm, the security officer who responded to the June 2023 incident. In addition to working security, Hamm is also the sergeant over criminal investigations at the Benton Police Department. Hamm testified that, on the day in question, Kayla requested assistance, he looked at the court orders, and he concluded Kayla should have had custody at the time but that Joshua was interfering. He said Joshua was adversarial with him. Seargeant Hamm referred the matter to the prosecutor's office, and Joshua was ultimately charged with interfering with custody.

After Kayla rested, Joshua testified. His testimony was that Kayla interferes with his phone visitation, will not allow him to have lunch with MC, and does not allow MC to have any extracurricular activities. He said his only problem with the MOU was that it needed to be more specific.

Joshua called his two daughters as witnesses. They testified they wanted to be able to see MC more often. He also called his mother, Karen Judkins. She testified that she believes the week-to-week visitation works well.

During closing argument, Kayla's counsel asked that she be awarded primary custody. Joshua's counsel stated that the terms from the MOU should continue but that "it might need to be tightened up a little bit."

The attorney ad litem was asked for her recommendation. She said that Joshua was trying to use his older daughters to infringe on Kayla's visitation time. She said her opinion is that Joshua is a bully. She acknowledged that, early in the case, she had insisted that joint custody would be best for MC, and she worked hard to help the parties craft the MOU for

joint custody. But after witnessing how Joshua operates under the MOU, her current recommendation was that Kayla have primary custody with full decision-making authority because, otherwise, "[Joshua] is going to create a problem and bulldoze her." That said, she also stated that she believed that MC needed more than "just" every other weekend with his father, and she therefore recommended an extended every-other-weekend schedule, with Joshua having visitation every other Wednesday to the following Monday.

The court took the matter under advisement and issued a written order within the week. That opinion made the following relevant findings:

6. [Kayla] requested she have full legal and physical custody of [MC] while [Joshua] also requested full custody. For the reasons given below the Court has determined by clear and convincing evidence that joint custody is not in the child's best interests, that the statutory presumption has been overcome, and that [Kayla] should be awarded full custody.

7. After hearing the evidence presented, the Court has determined there are numerous facts which indicate to the Court that joint custody is not in the minor child's best interests. The parties had through mediation came to a joint custody agreement through a Memorandum of Understanding (MOU). Subsequent to the MOU being entered by the parties on or about December 5, 2022, both parties have requested that this Court terminate this agreement. Both have sought full custody of the minor child at the final hearing. Additionally, [Joshua] seeks separate visitation time with the minor child and his two daughters from another relationship.

8. With respect to credibility, the Court finds that [Kayla]'s testimony to be more credible than [Joshua]'s based upon the Court's observations of the parties, their demeanor while testifying, and the consistency and/or inconsistency of their statements.

9. The Court is convinced that a joint custody situation will not work in this case. The evidence demonstrates that [Joshua] is controlling, verbally abusive, and bullies [Kayla] to get his way when it pertains to matters of custody as well as other issues this Court has heard. For example, [Joshua] has unilaterally changed the visitation times and pickup locations on his own without the agreement of [Kayla].

6

On one such occasion he kept the minor child an additional night and exchanged him the following morning. Just prior to Spring Break in 2023 he insisted [Kayla] would forfeit her holiday visitation time if she did not provide a Boys and Girls Club calendar to him. This is a document that should readily be available to him from the club and online. On numerous occasions he has picked the minor child up from school at lunch during [Kayla]'s custodial time and not return him to school for afternoon classes. This would require the parties to then schedule exchange times. On one such occasion [Kayla] specifically asked him to not pick up the child because she was planning on having lunch with him that day. This particular day was during her custodial time. He refused and picked the child up in spite of her reasonable request. On another occasion [Joshua] unilaterally changed the pickup location and time in order for the minor child to be in a class at the River Center in Riverside Park in Benton. He did so without consulting [Kayla] and just informed her of the changes. In viewing the video of the incident from the River Center, it appears [Joshua] would not allow [Kayla] to ride the elevator to the second floor with him and the minor child to where the class was located. [Kayla] testified that she was pushed out of the elevator by him. While the video does not show actual contact between the parties because of the location and angle of the camera, it does show [Kayla] attempting to enter the elevator only to back up and the doors close, which is consistent with her testimony. It also appears [Joshua] later pulled the minor child from [Kayla]'s arms when she was giving the child a hug. When questioned by an off-duty detective who was working security for the River Center about the incident, [Joshua] was non-compliant, was untruthful about the existence of court documents, and verbally abrasive when asked about [Kayla] leaving with the minor child since it was her custodial time. Based upon all of these facts, the Court is of the firm opinion that [Joshua] has intentionally interfered with [Kayla]'s custodial time.

10. In 2023 [Joshua] unilaterally changed the school the minor child attended when [Kayla] was the final decision maker for educational decisions pursuant to the MOU the parties had executed in 2022.

11. This past year [Joshua] insisted on scheduling his vacation time in order to allow him to have the minor child for three consecutive weeks. He refused to negotiate with [Kayla] to allow her to have any time during the three-week period. [Joshua] has again scheduled a three-week visitation period for the upcoming summer in 2024 and has been unwilling to negotiate with [Kayla] concerning taking extended time with the child.

12. [Joshua] has taken the minor child on trips outside the state and refused to provide travel information to [Kayla].

7

13. [Joshua] has uploaded incorrect calendar information in the coparenting app known as AppClose for doctor's appointments and medical visits which appears to have been done so [Kayla] would miss the appointment. He has refused to provide the child's therapist information to [Kayla].

14. [Joshua] has failed to abide by the orders of this Court with respect to the payment of child support and is presently in arrears by three months.

15. Additionally, it appears [Joshua] is seeking to limit or otherwise control [Kayla]'s custodial time by means of his request for sibling visitation with his two daughters and the minor child. When [Joshua] was appearing pro se, he filed a motion for sibling visitation. In it he stated that his daughters "wish to set up a visitation schedule that allows them free and easy access to their sibling(s) without having to go through either [Kayla] or [Joshua] to do so." [ ] His motion leaves the Court with the belief that [Joshua], through his two other children, is attempting to control and/or limit [Kayla]'s custodial times. His children may certainly see the minor child when he has them and there is no need for such an order unless he is attempting to interfere with [Kayla]'s time by virtue of a court order. For these reasons the request for sibling visitation is denied.

16. For all of the reasons listed in paragraphs 8 through 15 including those concerning credibility, the Court finds that the presumption stated in A.C.A. § 9-13-101 favoring joint custody has been rebutted by clear and convincing evidence. Therefore, the Court finds that [Kayla] having sole physical and legal custody is what is in the child's best interests pursuant to the statute, subject to [Joshua]'s rights of visitation.

17. With respect to making important life decisions for the minor child, normally this Court would require that the custodial parent consult with the other parent prior to making important decisions. For the reasons given above, the Court believes that the recommendations of the Ad Litem concerning parent consultation in this case are reasonable, in particular because [Joshua] has been verbally abusive, controlling, and bullies [Kayla] when given the opportunity to do so. For these reasons the Court will not require [Kayla] to consult with [Joshua] prior to making important decisions concerning the minor child. She is however required to keep him reasonably informed of these decisions as they may occur through AppClose.

. . . .

32. [Joshua] is hereby held in contempt for his non-payment of child support which he was ordered to pay on a temporary basis in the amount of $113.00 per

month. He is presently behind three months. Further, [Joshua] is held in contempt for failing to pay into the registry of the Court the parties' tax refund in the amount of $11,300.00 as directed by the Court. Lastly, [Joshua] is held in contempt for failing to abide by the visitation orders of this Court and his intentional interference with [Kayla]'s visitation times.

33. With respect to the contempt finding, [Kayla] is awarded $339.00 for three months of unpaid child support which shall be paid from the registry of the Court from the tax refund which is presently being held. Her attorney fees shall also be awarded for the costs associated with the contempt motions which were filed. [Joshua] is also sentenced to seven (7) days in the Saline County Jail which is suspended conditioned upon him not being found in contempt for violating the orders of this Court in the future.

From this order, Joshua appeals. On appeal he argues the circuit court erred when it awarded Kayla primary custody, in holding him in contempt, and in suspending his contempt sentence for an indefinite amount of time.

I. *Custody*

In an action for divorce, an award of joint custody is favored in Arkansas. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2023). In an action concerning an original child-custody determination in a divorce, there is a rebuttable presumption that joint custody is in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)*. Section 9-13-101(a)(1)(A)(iv)*(b)* provides that the presumption may be rebutted:

(1) If the court finds by clear and convincing evidence that joint custody is not in the best interest of the child;

(2) If the parties have reached an agreement on all issues related to custody of the child;

(3) If one (1) of the parties does not request sole, primary, or joint custody; or

9

(4) If a rebuttable presumption described in subsection (c) [which triggered if a party to the action has committed an act of domestic violence] or subsection (d) [which is triggered if a party to the action is a registered sex offender] of this section is established by the evidence.

The circuit court may enter an order to reduce areas of conflict in a manner determined appropriate by the court. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(d)*. But while there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child. *McCandlis v. McCandlis*, 2024 Ark. App. 339. We refuse to find differently than the circuit court regarding the appropriateness of joint custody and the credibility of the witnesses. *Id.*

On appeal, in custody matters, we consider the evidence de novo and do not reverse unless the circuit court's findings of fact are clearly erroneous. *Id.* Due deference is given to the circuit court's superior position to judge the credibility of the witnesses. *Chaffin v. Chaffin*, 2011 Ark. App. 293. The supreme court has held that there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than one involving the custody of minor children. *Styles v. Styles*, 2024 Ark. App. 435, at 22, 699 S.W.3d 693, 708–09.

Joshua argues that nothing in the record supports a finding that Kayla rebutted the presumption of joint custody. He contends that Kayla neither (1) demonstrated that joint custody was not in MC's best interest nor (2) established he had engaged in a pattern of domestic abuse. We agree with Joshua that a pattern of domestic abuse was not present such

10

that section 9-13-101(a)(1)(A)(iv)*(b)(4)* would have been triggered. But we disagree with his contention that joint custody was in MC's best interest.

Joshua compares his relationship with Kayla to the relationships of parents in *Wallace v. Pyle*, 2024 Ark. App. 496; *Pilcher v. McWilliams*, 2022 Ark. App. 487, 655 S.W.3d 868; *Cunningham v. Cunningham*, 2019 Ark. App. 416, 588 S.W.3d 38; and *Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297, and explains that joint custody can remain appropriate even when relationships are marked by conflict, poor communication, or questionable conduct.

In all of these cases (with the exception of *Pilcher*), however, we *affirmed* the circuit court's award of joint custody, specifically giving deference to the circuit court to weigh the evidence before it. In the lone exception, *Pilcher*, we reversed because the circuit court misapplied the statutory domestic-violence exception, section 9-13-101(a)(1)(A)(iv)*(b)(4)*, and cut its analysis short. That provision refers the reader to subsection (c), which provides that there is a presumption that it is not in the best interest of a child to be placed in the custody of a parent who has "engaged in a pattern of domestic abuse." And because the record in *Pilcher* contained evidence of only a single incident, there was therefore insufficient evidence to establish a "pattern." Because the circuit court relied on that provision as a matter of law without the required showing, we reversed and remanded.

Joshua argues that the evidence established that MC was doing well, is fine in both homes, and wants equal time with his parents. He highlights the ad litem's report that both parents are good people, work hard at parenting MC, are gainfully employed, and have stable

11

homes. He argues that the circuit court should have exercised its authority to reduce the areas of conflict between the parties, and joint custody should have been granted.

It is true that Arkansas law favors joint custody. But it is also reversible error to award it when the parties demonstrate an inability to cooperate and communicate in matters concerning their child. *See Hoover v. Hoover*, 2016 Ark. App. 322, at 7, 498 S.W.3d 297, 302 (stating that the mutual ability of the parties to cooperate is a crucial factor in determining whether joint custody is appropriate). Here, Joshua had almost two years to demonstrate to the court that he was capable of sharing joint custody of MC with Kayla. Instead, he demonstrated the opposite. Each child-custody determination ultimately must rest on its own facts. *Cunningham v. Cunningham*, 2019 Ark. App. 416, at 8, 588 S.W.3d 38, 42. The circuit court was well within its discretion to conclude that joint custody was not in MC's best interest. We affirm the custody award.

## II. *Contempt*

Joshua makes three arguments on appeal concerning contempt. First, he argues that the initial order to deposit the tax refund was too vague to enforce, and when the circuit court entered its more specific order, he timely complied with it. Second, he argues the circuit court erred when it found him in contempt for nonpayment of child support without first determining whether he had the ability to pay. Last, he argues that the circuit court entered an impermissible sentence when it sentenced him to jail for seven days but then suspended the same for an indefinite time period. He makes no argument regarding the finding that he interfered with visitation. We agree with two of his three points.

Willful disobedience of a valid order of a court is contemptuous behavior. *Symanietz v. Symanietz*, 2021 Ark. 75, at 13, 620 S.W.3d 518, 527. However, before one can be held in contempt for violating the court's order, the order must be definite in its terms and clear as to what duties it imposes. *Scudder v. Ramsey*, 2013 Ark. 115, at 12, 426 S.W.3d 427, 435. Contempt can be civil or criminal. *Id.*, 426 S.W.3d at 435. The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Id.*, 426 S.W.3d at 435. By comparison, civil-contempt proceedings are instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders made for the benefit of those parties. *Id.*, 426 S.W.3d at 435. Because the contempt findings here were civil, the standard of review is whether the circuit court's findings are clearly against the preponderance of the evidence. *Id.* at 13, 426 S.W.3d at 435.

To begin, Joshua was held in contempt for three reasons: nonpayment of child support, failing to deposit the tax refund into the registry of the court as directed, and interfering with Kayla's visitation. The sanctions for the contempt were that Kayla was awarded the amount of past-due child support from the registry of the court; Kayla's attorney fees were awarded "for the costs associated with the contempt motions which were filed"; and Joshua was sentenced to seven days in jail suspended "upon him not being found in contempt for violating the orders of this Court in the future."

We will address Joshua's point concerning the child-support finding, first. On appeal, Joshua argues that the court erred in holding him in contempt for failure to pay child support without first finding that he had the ability to pay it. The inability to pay is an affirmative

defense, and the contemnor has the burden of proving his inability to pay. This is logical because, in most cases, all of the items of proof needed to prove ability or inability to pay are in the hands of the contemnor. *Rogers v. Rogers*, 80 Ark. App. 430, 444–45, 97 S.W.3d 429, 439 (2003). Joshua was well aware that one of the issues to be resolved at the hearing was contempt for failure to pay child support since Kayla had testified to it immediately prior. If Joshua needed to mount a defense on inability to pay, he had the opportunity to do so, and he did not. We hold there was no error in finding Joshua in contempt for failure to pay child support.

We do, however, agree with Joshua that finding him in contempt for failure to pay the parties' tax refund into the registry of the court was erroneous.

The temporary order entered on June 29, 2022, stated that "[t]he parties were issued a tax [refund] valued at or about $11,300.00 based on testimony. [Joshua] shall submit this amount to the registry of the Court until a time that a ruling can be made on the disbursement of the funds." It did not contain a performance date. Joshua deposited funds into the registry on June 29, 2022 ($8,600); July 26, 2022 ($100); October 11, 2022 ($100); and December 8, 2022 ($100). Considering this partial performance and the lack of a performance date in the order, we cannot say that Joshua violated the court order such that contempt may be imposed. *See Holifield v. Mullenax Fin. & Tax Advisory Grp., Inc.*, 2009 Ark. App. 280, at 6, 307 S.W.3d 608, 612 (holding that an order was not specific enough to hold a litigant in contempt when ordered to submit to discovery on an "expedited basis," but no time frame was otherwise specified).

14

The second order entered on the matter was more specific. That order was entered on January 6, 2023. It provided that "the remaining balance of the $11,300.00 in marital funds that the Court previously Ordered to be deposited into the registry of the Court shall be deposited by [Joshua] within ten days of this Order or he shall be subject to the contempt powers of the Court." Joshua paid the remaining balance due, $2400, on January 19, 2023. Arkansas Rule of Civil Procedure 6(a) instructs that "[i]n computing any period of time prescribed . . . by order of the Court," if the time period prescribed is less than fourteen days, then we do not count Saturdays, Sundays, or legal holidays. Considering Martin Luther King Jr. Day was on January 16 in 2023, ten days from the date ordered would have been January 23, 2023. Therefore, when Joshua paid the remaining balance into the registry of the court on January 19, he had complied with the order of the court such that the specific finding of contempt was not supported by a preponderance of the evidence.

Finally, Joshua argues that the circuit court erred when it sentenced him to seven days in jail and then suspended the sentence for an indefinite amount of time. He is correct. It is well settled that suspension of a sentence for contempt is, in effect, a complete remission of the contempt. *Styles*, 2024 Ark. App. 435, at 27–28, 699 S.W.3d at 711–12. The jail sentence is therefore set aside.

In domestic-relations proceedings, the circuit court has the inherent power to award attorney's fees, and the decision to award fees and the amount of those fees are matters within the discretion of the circuit court. *Barter v. Barter*, 2024 Ark. App. 182, 686 S.W.3d 872. However, because the attorney's-fee sanction was possibly intertwined with all three

contempt findings—one of which was unsupported—we therefore reverse and remand the award of attorney's fees and costs for the circuit court to reconsider, if necessary.

In sum, we affirm the award of custody, reverse the contempt finding regarding the tax refund, set aside the jail-time sentence, reverse the contempt sanction insofar as it concerns attorney's fees and costs, and remand for the circuit court to reconsider any sanctions it chooses to impose for the remaining findings of contempt.

Affirmed in part; modified in part; reversed and remanded in part.

GLADWIN and HIXSON, JJ., agree.

*Stephen A. Shoptaw*, for appellant.

*LaPorte-Jenner Law, PLLC*, by: *Kelli LaPorte-Jenner* and *Frank LaPorte-Jenner*, for appellee.