Cite as 2026 Ark. App. 306

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-25-459

| | |
|---|---|
| | **Opinion Delivered** May 13, 2026 |
| CLINTON GREENWOOD | |
| APPELLANT | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63DR-24-17] |
| V. | |
| | HONORABLE BRENT DILLON HOUSTON, JUDGE |
| KATHRYN GREENWOOD | |
| APPELLEE | REVERSED AND REMANDED IN PART; DISMISSED WITHOUT PREJUDICE IN PART |

**KENNETH S. HIXSON, Judge**

Appellant Clinton Greenwood (Drew) appeals from the Saline County Circuit Court's order of protection dated March 13, 2024; order extending the order of protection dated April 11, 2025; and order of contempt.[1]  On appeal, Drew argues that (1) the circuit court clearly erred in entering the orders of protection on behalf of his son, Minor Child (MC), absent any evidence that he had abused his son, and (2) the court's order finding him in contempt and extending the previous order of protection should be reversed.  We dismiss without prejudice for lack of a final order in part and reverse and remand in part.

---

[1]Drew separately appealed from the Saline County Circuit Court order granting him a divorce from Kathryn (Katie) in companion case No. CV-25-460, which is also handed down today.  *See Greenwood v. Greenwood*, 2026 Ark. App. 290, ___ S.W.3d ___.

## I. *Relevant Facts*

On January 5, 2024, Katie filed a petition for an order of protection on behalf of herself and MC. In her affidavit attached to the petition, Katie alleged Drew had hit her in the face with a ceramic bottle, causing her to have a laceration and a black eye; threatened her; verbally attacked her in front of MC; withheld MC's formula; drove drunk with her and MC in the vehicle; and intentionally broke her cell phone to remind her to "be good." The circuit court entered a temporary ex parte order of protection on January 5, 2024, restraining Drew from committing any criminal acts against Katie and MC; prohibiting him from initiating any contact with Katie and MC; and setting a hearing. After a continuance, the hearing was held on March 13, 2024.

In brief summary, Drew admitted at the hearing that he and Katie had been married for three years and that they have one son together, MC. Drew also admitted that he hit Katie in the face on December 29, 2023, with a ceramic bottle that caused her to have a "gash" that was bleeding and that it was not the first time he had hit her. He explained that the two had an argument while he was driving and that he threw a brown paper bag at Katie to stop her from grabbing the steering wheel and punching the side of his head. Drew testified that he did not know there was a bottle in the bag when he threw it.

Katie recalled a different chain of events from the night she was struck, and she provided the following summary:

> We left his parents' house around three that afternoon. We were going in – we left, and we were going to the mall to shop and eat and go to the hockey game. When – I'm sorry. Okay. We left the hockey game around 10. On the way back we started

2

arguing.  He was yelling at me and calling me names, and I was very distressed, and I did open the car door.  He leaned over and was grabbing at me, so I was trying to close the car door, and I swatted at him to get off of me.  At that point he grabbed my head and my hand, and he pushed my head down into the middle console.  And he was yelling at me and threatening me.  He said he wanted to hit me.  I thought he wanted to hurt me.  He lifted my head up and that's when he took the bag with the bottle and he hit me in the eye.  It was painful.  And we ~ he pulled the car over.  I got out of the car, and I was gasping for air.  I was scared.  He came over and met me there and was yelling at me.  So I got into the back seat to get away from him, and he followed me into the back seat.  He shoved me, and he took my phone.  I got back out of the car yelling and screaming for help, and that I needed my phone, and he saw the cars that were pulled over, so he gave me my phone back.  I got back in the car, and I started to dial 911.  He told me ~ he was yelling at me and grabbing at me, and he said, do not call 911.  You'll get in trouble.  So I was just crying and scared and begging for help.  I heard him recording himself on his phone while I was crying and afraid.  Eventually we get in the car and drive to the next gas station.  He went inside to get me some water.  At that point I was terrified.  I didn't know what to do. I called my sister to tell her what had happened.  I couldn't talk long, and I didn't have much time with my phone.  He was coming back out, and he looked angry.  He told me to wash my face.  I washed the blood off my face, and we went back to his parents' house.  I think we got back around 11 or 11:30. I didn't see anybody that night.  I thought they were all asleep, but Drew told me that he had told his family what happened, and that I didn't need to tell anybody what happened because they knew.  We did sleep ~ well, I tried to sleep as best I could, but we were in the same bed, yes.  I was terrified.  I was terrified.

Photographs of Katie's injuries were admitted into evidence without objection.

Katie testified that there were other incidents of domestic violence that occurred before the December 29, 2023, incident.  She described the following incident that took place on the last night of their beach vacation in Florida:

And on the last night of vacation, or that last day, I found marijuana in his toiletry bag.  He was mad at me that I found it and didn't want him using.  Then later that night he was telling me that I needed to pack.  I needed to leave ~ we needed to leave early.  I was trying to leave later in the morning so that [MC] could wake up and be fed.  But at four o'clock in the morning he turned the lights on.  I could tell he was upset.  He uncovered the bed sheets and he started packing our things.  I got up to get my things back from him, and he pushed me down hard onto the ~ it was like a

3

hard wood or tile floor, and I fell on my hips. When I was able to get back up he pushed me down again, and I ~ hard on my side, and I was laying there crying. And he just watched me. And then I tried to get back up, and he was holding me down so hard by my arms that I couldn't move, and I was trying to get away from him. And I actually bit him to get away from him. And then I just kind of got my stuff together, and he went and woke up the baby and put the baby in the car. So I got into the car. I followed them down and got in the car with them. He drove quickly out of the driveway, and the baby was crying. So I was asking him to stop so I could feed him. He was ignoring me, and angry, and he kept driving. Driving faster and faster, and I was crying, and he told me, now I have to deal with both of you. Both babies. We drove like that for about an hour, until he finally let me feed [MC], and we were silent on the way home. I realized I had bruises on my arms and on my hips, and I was hurting and sore, and I told him. He said well, that's because you bit me, and you attacked me. Other times when we are arguing he holds me down by my arms like this, to where it's hard for me to breathe. He's pushed me in front of my son when I'm trying to change his diaper. He would push me and tell me I'm doing it wrong. And earlier on in marriage, he ~ I don't know what we were arguing about, but he took my phone and broke it. He threw it against the floor and shattered it and told me that I could look at that and remember to be good. And it was two years later that he finally got my phone fixed. After [MC] was born, he said that I've been good long enough.

Katie expressed her concerns about leaving MC alone with Drew. She explained that Drew has jokingly threatened to give MC too much medicine or allow MC to be left home alone. She also stated that Drew had previously left her and MC alone in a parking lot without any clothes, diapers, or formula. She was concerned that Drew might hurt her, MC, or himself. She asked that she be given custody of MC with Drew allowed only supervised visitation.

When Drew was recalled as a witness, he denied ever harming or threatening to harm MC. He further denied withholding any food from MC and stated that MC was fed on his normal schedule. He claimed that he did not intentionally try to harm Katie and regretted the incident on December 29, 2023. He explained that he was not aware that there was a

4

bottle of olive oil in the bag he threw at Katie to stop her. He disagreed that he needed supervised visitation with MC and expressed his desire to see MC as soon as possible.

The circuit court entered an order of protection on March 13, 2024, applicable to both Katie and MC. In relevant part, the order restrained Drew "from committing any criminal act against the victim(s) including, but not limited to: acts of violence or Domestic Abuse, A.C.A. § 9-15-103(3); Harassment A.C.A. § 5-71-208; Harassing Communications A.C.A. § 5-71-209; Stalking A.C.A. § 5-71-229; or Terroristic Threatening A.C.A. § 5-13-301." Drew was further "prohibited from initiating any contact with the victim(s) including but not limited to physical presence, telephonic, electronic, oral, written, visual, or video. [Drew] also shall not use a third party to contact the victim(s) except by legal counsel or as authorized by law or court order." Although Katie was awarded temporary custody of MC for the duration of the order or until future orders were issued from a court with jurisdiction, Drew was allowed supervised visitation with MC every other weekend. The circuit court provided that any communication concerning visitation or any other matter concerning MC would be through Katie's and Drew's parents. The circuit court additionally ordered Drew to pay child support in an amount "to be determined by supplemental order after exchange of [affidavits of financial means]."

A supplemental order regarding child support was never entered according to the record before us. Seven months later, Katie filed a motion for contempt on October 25, 2024. She alleged that Drew should be held in contempt and the order of protection extended because he had violated the court's order of protection by harassing and stalking

her, initiating contact with her, and using a third party to contact her. Katie asked that Drew be ordered to appear and show cause as to why he disobeyed the order. She requested that she be awarded attorney's fees and costs and that Drew be incarcerated for violating the order of protection.

Drew filed his response and denied that he had violated the order of protection. He asked that he be reimbursed for his attorney's fees and costs and that Katie be fined or otherwise sanctioned for filing her untimely and factually unsupported motion.

After continuances, a hearing on Katie's motions began on January 23, 2025, and concluded on April 7, 2025. Drew testified that he had received a copy of the March 13, 2024, order of protection and that he understood that he could be incarcerated for any violation of the order. Drew admitted that he had access to Katie's Spotify account through the television in the living room in the marital home. Katie and MC were no longer living in the marital home. He explained that he first accessed Katie's account in the spring of 2024 when he was hosting a small church group and wanted to listen to music. He could not remember the exact date. He admitted that he looked through the book titles Katie had in her Spotify account and found them to be disturbing. Drew admitted that he accessed the account a second time and took photographs of the information in the account to give to his attorney. Drew claimed that he never "logged into" the account but stated that it was "already logged in" on the television, which allowed him to "access . . . [Katie's] Spotify account through the TV." Drew also admitted that he sent a message to Katie's friend because he wanted to check on Katie because he "cared." Drew denied attempting to access

6

Katie's Facebook or email accounts, breaking into Katie's vehicle, or using Katie's two cell phones before they were retrieved from the home in September 2024.

On cross-examination, Drew testified that he had found Katie's two older cell phones in a laundry basket in the laundry room when taking an inventory on September 25, 2024. He claimed that he did not know they were there and that he immediately notified his attorney when he found them at the house. Drew admitted that he plugged in the cell phones in the kitchen to charge them in accordance with his attorney's advice and had planned to take them to his attorney's office; however, Katie arrived with police to retrieve them approximately forty-five minutes later. Drew testified that Katie had another old cell phone during their marriage but that the parties had traded that phone in for her new one in July 2023. Drew further testified that he did not intend to violate the order of protection by asking Katie's friend, Kendal Golden, if Katie was okay.

On redirect, when asked whether he was "monitoring what [Katie] was reading" through her Spotify account, Drew responded, "I wouldn't say I'm monitoring it. It was something I observed and sent. I think monitor would be something that I'm like keeping up with regularly." He admitted that he "individually clicked on multiple books, six times . . . to video and take pictures of what Katie was doing[.]" Drew admitted that he asked Ms. Golden whether Katie was "doing okay." However, he claimed he was not trying to monitor Katie because he did not ask "what she's doing" but only wanted to know "how Katie's doing."

Deputy Jeremy Hollaman testified that he assisted Katie in retrieving her cell phones from Drew's home in September 2024. He explained that one phone was located in the bedroom and another one was on the kitchen counter. Katie also retrieved a backpack that had a computer hanging out of it.

Kendal Golden testified that she received a message from Drew on Facebook Messenger in June 2024 asking how Katie was doing. She could not recall the exact date she received the message. She explained that she did not respond to the message and had blocked Drew so that she did not have any further contact with him.

Katie testified that she had not been to the marital home where Drew resided since the order of protection was entered except on two occasions. She went on one occasion with Deputy Hollaman to retrieve her belongings and on a second occasion to inventory the home with permission from the circuit court in the divorce case. Katie explained that she had forgotten about her two older cell phones until she had received "notifications that the phones were active in [her] Google and Gmail" during the summer of 2024. She was afraid that Drew had them in his possession and was using them. When asked about the notifications she received, Drew's counsel objected on hearsay grounds. The circuit court overruled after Katie's counsel argued that it was not hearsay because it formed the basis for Katie's subsequent action. Katie explained that she had received more than ten notifications or emails over a period of eight months:

> I was getting emails that my password had been changed, that my phone was being activated on other devices, and that I was getting prompts that were notifying me that

8

somebody was trying to log into my Google and gmails through other phones. I was getting notifications that somebody had been logging into my Spotify and Facebook.

Katie explained that she also received a notification that her Spotify account was also used to access her Facebook account. She said that she had not attempted to access her Facebook account and had in fact deleted her Facebook account before she received the notifications. Other than Drew, Katie did not know anyone who would have her personal information to access her accounts. She ended up changing passwords multiple times and discovered that the two cell phones she eventually retrieved were able to open her Google and Gmail accounts without having to log into the accounts. Katie explained that at least one of the two phones was plugged in and turned on when she retrieved the phones from the home.

Katie testified that she thought Drew had used a spare key to break into her vehicle and steal her debit card because there were no signs of forced entry. However, she admitted that she did not contact the police after the incident.

Katie explained that she was alarmed after discovering that Drew had sent a message to Ms. Golden. She stated that she thought Drew was trying to "use [her] best friend to get to [her] and keep tabs on what [she] was doing." She agreed that the message was another example of Drew's trying to monitor her. Katie stated that she was "scared" and thought she was "going crazy" when she discovered someone had accessed her Spotify account. She sought the assistance of Apple and AT&T to help her "figure out how to get [her] devices removed . . . from [her] account and [her] account removed[.]" She explained that they had tried to assist her, but she continued to get prompts. Katie was able to access all her photos,

her emails, her Spotify account, and her location through the Find My application on the two cell phones retrieved at the house in September 2024. Although she acknowledged that Drew testified that he traded in a third phone in 2023, Katie stated that she did not trade in that phone. She later testified that she believed Drew still had that third cell phone in his possession.

Katie asked that the order of protection be extended as a form of relief. She also asked that Drew be found in contempt of the order of protection, ordered to pay her $5,000 in attorney's fees and costs, and incarcerated.

On cross-examination, Drew's counsel asked Katie what evidence she had to prove that the notices came from the two cell phones she retrieved. Katie's counsel interjected that Katie had documentation and explained that although Drew's counsel had previously objected to them, Drew's counsel had now "opened the door." The circuit court agreed, and Drew's counsel asked that the documents be admitted into evidence. Drew's counsel asked Katie about the screenshots and other documentation regarding the notifications she received. Katie explained that some of the photographs showed that Drew would have been able to access her accounts simply by clicking the applications on the phone. When asked whether she had any proof that Drew actually used the cell phones to access the applications, Katie stated that at least one of the cell phones was plugged in and turned on when it was retrieved from the house. Katie stated that Drew knew her password to unlock the cell phone. She admitted that none of the documentation specifically stated that "Drew Greenwood attempted to access Facebook through Spotify at the marital residence[.]" Katie

10

further admitted that she had previously lied to Drew about MC's being in a car accident in a text that she sent to him before the order of protection was filed. She testified that she regretted not being honest with Drew on that occasion, but she maintained that she was being honest in her testimony to the circuit court.

When the hearing was reconvened on April 7, Drew was recalled as a witness. Drew initially reiterated that he had accessed Katie's Spotify account on the television only twice. However, later he stated that he was "not sure" if "it could be more than two times." Drew had admitted that he first accessed the account when he was hosting a small church group at his home and was trying to listen to music. He further admitted that he accessed the account on a second occasion to take photographs to send to his attorney. Although some of the photographs had the date May 19, 2024, handwritten on them, Drew did not know if that was the date the photographs were taken or the date his attorney received them. He said he did not know when the photographs were taken. That said, he later admitted that another photograph reflecting a date in October or December 2024 must have been taken on that date because there were Christmas decorations in the photograph. That photograph was admitted into evidence without objection.

Ms. Golden testified that she had been able to look at her phone since the previous hearing to determine the date Drew sent her the message asking about Katie. She explained that Drew sent her the message on June 16, 2024.

After the parties presented all evidence, the circuit court heard closing arguments. Katie's counsel argued that Drew had violated the order of protection because the evidence

11

showed that he had accessed her Spotify account on at least three occasions if not more and contacted Katie's best friend to inquire about Katie. Counsel further explained that the evidence showed that Drew had used the two cell phones in his possession to access Katie's personal information. Accordingly, she argued that the preponderance of the evidence showed that he violated the court's order either by harassing or stalking Katie.

Drew's counsel argued that Drew should not be held in contempt. In relevant part, she argued that accessing the Spotify account was not a violation because he was not using the account to communicate with Katie. She further argued that Katie lacked credibility because Katie admitted she had lied to Drew about a car accident. Regarding the message to Ms. Golden, Drew's counsel maintained that Drew did not violate the order of protection because he did not ask Ms. Golden to communicate with Katie on his behalf.

When the circuit court asked why Drew's actions were not considered "monitoring," Drew's counsel argued that accessing the Spotify account on three occasions should not be considered monitoring. She explained that Drew accessed the account the first time and contacted her after seeing "disturbing things." Counsel admitted that she had asked him to access the account again to take a photograph to send to her office. Although counsel admitted there was evidence that Drew accessed the account a third time to take another photograph, she did not think those actions constituted monitoring under the statute.

After hearing closing arguments, the circuit court took the matter under advisement. On April 11, 2025, the circuit court filed its written order. The circuit court did not find that Drew's actions constituted harassment as defined in Arkansas Code Annotated section

12

5-71-208 (Repl. 2024) nor did it find that Drew used a spare key to access Katie's vehicle. The circuit court did, however, find by a preponderance of the evidence that Drew's actions constituted stalking as defined in Arkansas Code Annotated section 5-71-229 (Repl. 2024). In pertinent part, the circuit court made the following specific findings:

7. Next, the relevant sections of A.C.A.§ 5-71-229 defines "Stalking" and "Course of Conduct" as follows, to-wit:

(a)
(1) A person commits stalking in the first degree if he or she knowingly engages in a course of conduct that would place a reasonable person in the victim's position under emotional distress and in fear for his or her safety or a third person's safety, and the actor:

(A) Does so in contravention of an order of protection consistent with the Domestic Abuse Act of 1991, § 9-15-101 et seq., or a no contact order as set out in subdivision (a)(2)(A) of this section, protecting the same victim, or any other order issued by any court protecting the same victim;

and

(f) As used in this section:
(1)
(A) "Course of conduct" means a pattern of conduct composed of two (2) or more acts, separated by at least thirty-six (36) hours, but occurring within one (1) year, including without limitation an act in which the actor directly, indirectly, or through a third party by any action, method, device, or means follows, monitors, observes, places under surveillance, threatens, or communicates to or about a person or interferes with a person's property.

8. With respect to the definition of "Course of Conduct", the statue prohibits an actor from monitoring another person, which is the relevant section of the statute for this case. The precise language uses the term "monitors" in this regard. While not defined by the statute, the Merriam-Webster Dictionary defines "monitor" as to watch, keep track of, or check usually for a special purpose. The Court believes that the plain meaning of the language used in the statute is unambiguous. The definition of "monitor" as determined by the Merriam-Webster Dictionary should be utilized for purposes of analyzing the

above statutory language to determine if a violation of the Final Order of Protection has occurred.

9.    With respect to the allegation that the Respondent has stalked the Petitioner, after considering the preponderance of the evidence presented, the Court is convinced that the Respondent has stalked the Petitioner in violation of the Final Order of Protection. The facts which support this finding are as follows, to-wit:

(a)    On more than one occasion the Respondent admitted to accessing the Petitioner's Spotify account. While the exact number of times the account was accessed was in dispute, the Court believes that the total number of times was at least three (3) but less than or equal to five (5) times. Spotify is best described as being an app used on cell phones, tablets, and other electronic devices for the purpose of listening to music, podcasts, and audio books. While the Respondent asserted that his subsequent accessing the account was done at his attorney's instructions, the discovery of the account on the home television and the initial search of the account by the Respondent for the purpose attempting to gain insight into what audiobooks the Petitioner was accessing was not done at his attorney's direction. The multiple times the Respondent assessed the account, regardless of his attorney's instructions, were in the Court's opinion an unlawful "monitoring" of the Petitioner in violation of the Final Order of Protection. The Respondent undertook more than one search of the Petitioner's account for the purpose of supposedly obtaining evidence in the divorce case. Ultimately, this information was never used in their divorce case in any meaningful way (*See Greenwood vs. Greenwood*, 63DR-24-146). The Respondent knowingly accessed this account for the purpose of monitoring the Petitioner and her activities. The reason given by the Respondent is irrelevant because it violated a Final Order of Protection. If this information was necessary for the divorce case, it should have been obtained through lawful means of discovery.

(b)    The Court heard credible testimony that someone other than the Petitioner was attempting to access her Facebook account. The Respondent denied he had ever attempted to do so. The Court is of the opinion that the circumstantial proof of this case indicates by a preponderance of the evidence that the Respondent did in fact attempt to access this account. This finding is based upon the proof the Petitioner presented that someone was attempting to access her

14

Facebook account; that the Respondent had possession of two older cell phones which had the ability to access the Petitioner's Facebook account; that when the Petitioner arrived with a police officer to retrieve personal property at the marital home, at least one of these cell phones was on a charger in the kitchen, which indicates it either had been used or was about to be used for some purpose; and the Respondent's acknowledgment that he was searching the Petitioner's Spotify account for evidence in their divorce case, indicates to the Court that given the opportunity, which the Respondent had, that he would also attempt to access the Petitioner's Facebook account for the same purpose. The Court is also keenly aware that Facebook would potentially have more probative evidence relevant to a custody proceeding than Spotify would ever have, given the nature of Facebook and the social media posts and messaging which occurs in that forum.

(c)     The Respondent admitted to sending a Facebook message to the Petitioner's best friend, Ms. Golden, inquiring about the Petitioner. This message was after the Final Order of Protection was in place. The exact statement read "Hey. Surely you've been keeping up with Katie. Is she doing ok?" While the Respondent attempted to downplay the communication and asserted the message pertained to him informing Ms. Golden that he was married and not interested in having a romantic relationship with her, none of that is contained within this statement. The Respondent, in the Court's opinion, was doing exactly what his message asked, he was seeking information about the Petitioner, in order to monitor her, by virtue of her best friend.

(d)     The Court heard testimony from the Petitioner, which it believes to be credible, that she was fearful of the Respondent's actions in monitoring her. Given the entry of the order of protection and the personal injuries the Petitioner had sustained at the time at the hand of the Respondent, her fear was not an unreasonable one under the circumstances. These events would have reasonably caused her emotional distress after she learned the Respondent had knowingly undertaken these actions.

(e)     With respect to the allegation that the Respondent accessed the Petitioner's vehicle with a spare key, the Court is not convinced there was sufficient evidence to establish this occurred.

15

10.     All of the above actions of the Respondent described in paragraph 9 above, took place following the entry of the Final Order of Protection. These actions (meaning more than two (2)) all occurred within one (1) year of the other and each were separated by at least thirty-six (36) hours of time. These actions therefore fall within the definition of "course of conduct" as defined by A.C.A. § 5-71-229(f)(l)(A).

11.     Based upon the foregoing findings of fact, the Respondent is found to be in contempt of court for violating the Final Order of Protection in that he stalked the Petitioner; for his willful actions he is sanctioned as follows, to-wit:

    (a) A commitment to the Saline County Jail to serve a sentence of five (5) days with five (5) days suspended. The sentence shall remain suspended so long as the Respondent does not again violate the terms of the Final Order of Protection which was entered in this case; and

    (b) The Respondent is ordered to pay the Petitioner the sum of $2,500.00 in attorney fees within thirty (30) days of the entry of this order.

12.     Based upon the violation of the Final Order of Protection, and the Court's belief that a threat of domestic violence still exits, the Court believes that the Final Order of Protection should be extended. Pursuant to A.C.A. § 9-15-205, the Final Order of Protection is hereby extended to March 13, 2030.

This appeal followed.

## II. *Jurisdiction*

The question of whether an order is final and subject to appeal is a jurisdictional question that this court will raise sua sponte. *Kowalski v. Rose Drugs of Dardanelle, Inc.*, 2009 Ark. 524, 357 S.W.3d 432. Drew appeals from the following findings: (1) the initial March 13, 2024, order of protection; (2) the finding of contempt and sanctions imposed in the April 11, 2025 order; and (3) the extension of the order of protection[2] pursuant Arkansas

---

[2]To the extent Drew argues in his appellate brief that the circuit court extended the order of protection as a sanction for Drew's contempt, he is mistaken. Paragraph 11 of the

Code Annotated section 9-15-205 (Repl. 2020) that was granted in the April 11, 2025, order. However, because we lack jurisdiction at this time, we must dismiss appellant's appeal from the March 13, 2024, order of protection and from the April 11, 2025, order granting an extension of the order of protection.

The Domestic Abuse Act allows the circuit court to provide relief to a petitioner under Arkansas Code Annotated section 9-15-205 upon a finding of domestic abuse, including but not limited to excluding the abusing party from the petitioner's or victim's dwelling, place of business or employment, school, or other location; awarding temporary custody or establishing temporary visitation; ordering temporary support for minor children or a spouse; prohibiting the abusing party from contacting the petitioner or victim directly or through an agent except under any specific conditions named in the order; and ordering any other relief the court deems necessary or appropriate for the protection of the family or household member. We have held that a final order of protection entered in circuit court pursuant to section 9-15-205 is appealable under Rule 2(a)(1) of the Arkansas Rules of Appellate Procedure–Civil. *See Smith v. Murphy*, 2017 Ark. App. 188, 517 S.W.3d 453. For an order to be final and appealable, it must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject matter in controversy. *Robinson v. Villines*, 2012 Ark. 211. Stated another way, for an order to be final and appealable, the

---

court's order imposed only two sanctions for Drew's contempt. Although the circuit court granted Katie's additional request for relief by extending the order of protection, it explained in paragraph 13 of its order that it was doing so pursuant to Arkansas Code Annotated section 9-15-205.

17

order must put the court's directive into execution, ending the litigation or a separable branch of it. *Id.* By contrast, an order that contemplates further action by a party or the court is not a final, appealable order. *Id.* Although the purpose of requiring a final order is to avoid piecemeal litigation, a circuit court may certify an otherwise nonfinal order for an immediate appeal by executing a certificate pursuant to Rule 54(b) of the Arkansas Rules of Civil Procedure. *Id.* When no final or otherwise appealable order is entered, this court lacks jurisdiction to hear the appeal. *State ex rel. Rutledge v. Purdue Pharma L.P.*, 2021 Ark. 133, 624 S.W.3d 106.

In *Dobbs v. Dobbs*, we dismissed an appeal from an order of protection because "the conditional nature of the trial court's order denie[d] us jurisdiction." 99 Ark. App. 156, 158, 258 S.W.3d 414, 416 (2007). We explained that "[s]ubject to a very few exceptions not applicable in this case, this court only has jurisdiction to decide cases where a final order has been entered." *Id.* at 157, 258 S.W.3d at 415. The same is true here. The court's order of protection clearly contemplated further action because it ordered Drew to pay child support in an amount "to be determined by supplemental order after exchange of [affidavits of financial means]." The circuit court has not filed a supplemental order as contemplated according to the record before us, and the subsequent entry of the April 11, 2025, order does not remedy this jurisdictional issue. Therefore, because the order of protection contemplates further judicial action and there is no certificate complying with Arkansas Rule of Civil Procedure 54(b), we must dismiss the appeal in part regarding the order of protection dated March 13, 2024, and the extension of the order of protection dated April 11, 2015,

18

without prejudice for lack of a final order. *See Roach v. Roach*, 2019 Ark. App. 34, 571 S.W.3d 487; *Dobbs*, *supra*.

### III.  *Contempt*

We turn now to the order of contempt.  An order that imposes a sanction and constitutes the final disposition of a contempt matter is immediately appealable as an interlocutory order under Rule 2(a)(13) of the Arkansas Rules of Appellate Procedure–Civil. *See Tackett v. Miller-Claborn Oil Distrib. Co., Inc.*, 2024 Ark. App. 359, 690 S.W.3d 807.  As such, we do have jurisdiction to review the portion of the circuit court's April 11, 2025, order finding Drew in contempt and imposing sanctions.

Although Drew makes several arguments for reversal, we hold that Drew's sufficiency argument is dispositive.  In relevant part, Drew argues that his actions should not have caused a reasonable person to be in fear of his or her safety and that his actions therefore did not constitute stalking because none of the information he obtained allowed him "to actually 'keep track of' Katie."  We agree that there was insufficient evidence to support the circuit court's findings.

In a nonjury civil trial, a challenge to the sufficiency of the evidence need not be raised below to preserve it for appellate review.  *Bohannon v. Robinson*, 2014 Ark. 458, 447 S.W.3d 585.  The disobedience of any valid judgment, order, or decree of a court having jurisdiction to enter it may constitute contempt.  *Scudder v. Ramsey*, 2013 Ark. 115, 426 S.W.3d 427.  However, before one can be held in contempt for violating the court's order, the order must be definite in its terms and clear as to what duties it imposes.  *Id.*  Our

standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Id.*; *see also Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004).

The circuit court's order of protection definitely and clearly stated that Drew was "restrained from committing any criminal act against the victim(s) including . . . Stalking A.C.A. § 5-71-229." Arkansas Code Annotated section 5-71-229 provides the following relevant definition for stalking:

> (a)(1) A person commits stalking in the first degree if he or she knowingly engages in a course of conduct *that would place a reasonable person in the victim's position under emotional distress and in fear for his or her safety or a third person's safety*, and the actor:
>
> (A) Does so in contravention of an order of protection consistent with the Domestic Abuse Act of 1991, § 9-15-101 et seq., or a no contact order as set out in subdivision (a)(2)(A) of this section, protecting the same victim, or any other order issued by any court protecting the same victim;
>
> . . . .
>
> (f) As used in this section:
>
> (1)(A) "Course of conduct" means a pattern of conduct composed of two (2) or more acts, separated by at least thirty-six (36) hours, but occurring within one (1) year, including without limitation an act in which the actor directly, indirectly, or through a third party by any action, method, device, or means follows, monitors, observes, places under surveillance, threatens, or communicates to or about a person or interferes with a person's property.
>
> (B) "Course of conduct" includes without limitation sending mail or electronic communication to a person via electronic mail, text messages, or any other type of electronic message sent using the internet, websites, or social media platforms.
>
> (C)(i) "Course of conduct" does not include constitutionally protected activity.

20

(ii) If the defendant claims that he or she was engaged in a constitutionally protected activity, the court shall determine the validity of that claim as a matter of law and, if found valid, shall exclude that activity from evidence;

(2)(A) "Emotional distress" means significant mental suffering or distress.

(B) "Emotional distress" does not require that the victim sought or received medical or other professional treatment or counseling[.]

(Emphasis added).

Regardless of whether his actions satisfied the definition of "course of conduct," we agree that there was insufficient evidence to show that Drew's actions "would place a reasonable person in the victim's position . . . in fear for *his or her safety or a third person's safety*." Ark. Code Ann. § 5-71-229(a)(1) (emphasis added). Certainly, Katie testified that she was afraid; however, Katie's subjective fear is not the standard required under the statute. The circuit court found by a preponderance of the evidence that Drew had accessed Katie's Spotify account on at least three occasions, attempted to access her Facebook account, and sent a Facebook message to Katie's best friend that stated, "Surely you've been keeping up with Katie. Is she doing ok?" From the evidence presented at the hearing, it is clear that Drew obtained a list of Katie's audiobooks through accessing her Spotify account. However, under the facts as presented, we cannot say that knowledge of a person's booklist would place a reasonable person in fear of his or her *safety*. We acknowledge that one of the exhibits entered into evidence showed that Katie had received a notification that her Facebook account had been "reactivated by a recent login to the application Spotify" and that the court found that Drew had, in fact, attempted to access Katie's Facebook account. However, Katie

21

admitted that she had previously deleted her Facebook account and that she was not using the application. Therefore, even if Drew had accessed her old account (the court found that he only "attempted" access), Katie failed to prove how his access to that old information on Facebook would place a reasonable person in fear for his or her *safety*. Drew admitted that he asked Katie's friend whether Katie "was doing okay," but he received no response. Again, Katie failed to prove why Drew's question would place a reasonable person in fear of his or her *safety*. Accordingly, because we cannot hold that Drew violated the circuit court's order restraining him from stalking, we hold that the circuit court's contempt finding was clearly against the preponderance of the evidence. We reverse and remand the part of the April 11, 2025, order finding Drew in contempt of court; and we reverse the sentence and the award of attorney's fees emanating from the order. Because we reverse and remand the contempt finding, it is unnecessary for us to address any of Drew's alternative arguments for reversal.

IV. *Conclusion*

In conclusion, we reverse and remand the circuit court's finding of contempt and dismiss without prejudice the remainder of the appeal for lack of a final order.

Reversed and remanded in part; dismissed without prejudice in part.

KLAPPENBACH, C.J., and GLADWIN, J., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellant.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Lauren White Hoover*, for appellee.

22